No. 21-13146

IN THE
# United States Court of Appeals for the Eleventh Circuit

ERIC STEINMETZ; MICHAEL FRANKLIN; AND SHENIKA THEUS,
*individually and on behalf of all others similarly situated,*

Plaintiffs-Appellees,

v.

BRINKER INTERNATIONAL, INC.,

Defendant-Appellant.

On Fed. R. Civ. P. 23(f) Appeal from the
United States District Court for the Middle District of Florida
in Case No. 3:18-cv-00686-TJC-MCR (Corrigan, J.)

## BRIEF FOR APPELLANT

JASON K. FAGELMAN
BARTON W. COX
PHILIP A. TARPLEY
SARAH CORNELIA
NORTON ROSE FULBRIGHT US LLP
220 Ross Avenue, Suite 3600
Dallas, TX 75201
(214) 855-8000

JONATHAN S. FRANKLIN
PETER B. SIEGAL
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466
jonathan.franklin@nortonrosefulbright.com

November 16, 2021

*Counsel for Appellant
Brinker International, Inc.*

Steinmetz, *et al.* v. Brinker International, Inc., No. 21-13146

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate procedure 26.1 and 11th Cir. R. 26.1-2(b), Appellant Brinker International, Inc. hereby certifies that upon information and belief, the following persons and entities have an interest in the outcome of this case.

1.    Ahdoot & Wolfson, PC (counsel for Plaintiffs/Appellees)

2.    Alamillo, Peter (former Plaintiff)

3.    Anderson, Jaclyn L. (counsel for Plaintiffs/Appellees)

4.    Barthle, Patrick A. (counsel for Plaintiffs/Appellees)

5.    Brinker International, Inc.; NYSE:EAT (Defendant/Appellant)

6.    Clark, Miles (counsel for Plaintiffs/Appellees)

7.    Cornelia, Sarah B. (counsel for Defendant/Appellant)

8.    Corrigan, Hon. Timothy J. (U.S. District Court Chief Judge in originating court)

9.    Cox, Barton W. (counsel for Defendant/Appellant)

10.    Fagelman, Jason K. (counsel for Defendant/Appellant)

11.    Federman, William B. (counsel for Plaintiffs/Appellees)

12.    Federman & Sherwood (counsel for Plaintiffs/Appellees)

13.    Franklin, Jonathan (counsel for Defendant/Appellant)

14.    Franklin, Michael (Plaintiff/Appellee)

Steinmetz, *et al.* v. Brinker International, Inc., No. 21-13146

15.   Fuller, Daniel (counsel for Defendant/Appellant)

16.   Green, Christopher (counsel for Defendant/Appellant)

17.   Green-Cooper, Marlene (former Plaintiff)

18.   Hannon, Kevin S. (counsel for Plaintiffs/Appellees)

19.   The Hannon Law Firm, LLC (counsel for Plaintiffs/Appellees)

20.   Hendrix, Nicholas (former counsel for Defendant/Appellant)

21.   Kasdan Turner Thompson Booth LLP (former counsel for
      Plaintiffs/Appellees)

22.   Kester, Francesca (counsel for Plaintiffs/Appellees)

23.   Knepper & Clark, LLC (counsel for Plaintiffs/Appellees)

24.   Lang, Christopher (former Plaintiff)

25.   Lawrence, Brian Christopher (counsel for Defendant/Appellant)

26.   LippSmith, Graham B. (counsel for Plaintiffs/Appellees)

27.   LippSmith, MaryBeth (counsel for Plaintiffs/Appellees)

28.   LippSmith LLP (counsel for Plaintiffs/Appellees)

29.   Lowndes, Drosdick, Doster, Kantor & Reed, PA (counsel for
      Defendant/Appellant)

30.   Martin, Jean Sutton (counsel for Plaintiffs/Appellees)

31.   Morgan & Morgan, PA (counsel for Plaintiffs/Appellees)

32.   Norton Rose Fulbright US LLP (counsel for Defendant/Appellant)

*Steinmetz, et al.* v. *Brinker International, Inc.*, No. 21-13146

33.    Richardson, Hon. Monte C. (U.S. Magistrate Judge in originating
       court)

34.    Reddy, Kenya (counsel for Plaintiffs-Appellees)

35.    Sanders, Fred (former Plaintiff)

36.    Sauder, Joseph G. (counsel for Plaintiffs/Appellees)

37.    Sauder Schelkopf, LLC (counsel for Plaintiffs/Appellees)

38.    Siegal, Peter B. (counsel for Defendant/Appellant)

39.    Sorrell, W. Drew II (counsel for Defendant/Appellant)

40.    Steinmetz, Eric (Plaintiff/Appellee)

41.    Summers, Daniel (former Plaintiff)

42.    Tarpley, Philip A (counsel for Defendant/Appellant)

43.    Theus, Shenika (Plaintiff/Appellee)

44.    Wolfson, Tina (counsel for Plaintiffs/Appellees)

45.    Yanchunis, John Allen (counsel for Plaintiffs/Appellees)

Steinmetz, *et al.* v. Brinker International, Inc., No. 21-13146

Corporate Disclosure Statement

Brinker International, Inc. ("Brinker") is a publicly traded corporation

(NYSE: EAT).  Brinker has no parent company, and no publicly held corporation

owns 10% or more of Brinker's stock.

> */s/ Jonathan S. Franklin*
> Jonathan S. Franklin

November 16, 2021                    *Counsel for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

As shown below, the legal errors in the order on review are readily apparent and clearly warrant reversal.  Nevertheless, appellant Brinker International, Inc. ("Brinker") believes that oral argument would assist the Court with its resolution of this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CITATIONS ...................................................................... iii

INTRODUCTION .............................................................................1

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ...............................................................................9

STATEMENT OF THE ISSUES...............................................................9

STATEMENT OF THE CASE.................................................................10

    A.    Factual Background...........................................................10

    B.    The District Court's Order And The Petition For Interlocutory Appeal.........................................................................14

SUMMARY OF ARGUMENT ...............................................................19

STANDARD OF REVIEW ...................................................................22

ARGUMENT ...................................................................................22

  I.    THE ORDER CONTRAVENES BINDING PRECEDENT BY CERTIFYING CLASSES THAT CONSIST ALMOST ENTIRELY OF UNINJURED MEMBERS ............................................22

  II.    THE ORDER CONTRAVENES *TRANSUNION* AND *CORDOBA* BY IGNORING THE NEED TO CONDUCT MILLIONS OF MINI-TRIALS ON CONTESTED, INDIVIDUALIZED ISSUES .......33

  III.  THE ORDER'S "AVERAGING" PROPOSAL VIOLATES THE RULES ENABLING ACT AND RULE 23 AND CONTRAVENES CLEAR SUPREME COURT PRECEDENT ..........40

CONCLUSION ..................................................................................49

CERTIFICATE OF COMPLIANCE WITH WORD VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**Page(s)**

**CASES:**

*Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) ............................4, 48

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ........................................40

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ............19, 20

*Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017) .................................................2

*Brown v. Electrolux Home Prods.*, Inc., 817 F.3d 1225 (11th Cir. 2016) ...........................................................................................................22, 48

\* *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................*passim*

\* *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...........................................*passim*

\* *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ...........................................................................................................*passim*

*Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016) ....................................40

*Dairy Queen, Inc. v.* Wood, 369 U.S. 469 (1962) ...............................................43

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ..............................32

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) .....................38, 39, 43

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021) ....................................................................................26

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013) ..................................................................................2

*In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184 (3d Cir. 2020) ........................................................................................................44

iii

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019) ............................................................6, 32, 38, 39

*In re Supervalu, Inc.*, 870 F.3d 763 (8th Cir. 2017) ..............................26, 27, 28

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................38

*McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121 (C.D. Ill. Jan. 19, 2021) ....................................................................................2

*McMorris v. Carlos Lopez & Assos., LLC*, 2021 WL 1603808 (2d Cir. Apr. 26, 2021) ...........................................................................26

*Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020) ...........................................................................................24

*Orduno v. Pietrzak*, 932 F.3d 710 (8th Cir. 2019)...............................................39

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006)...................................32

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ...........................................................................................28

*Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011)................39

*Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011)........................................27

*Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004) ...............43

*Rodriguez v. Nat'l City Bank*, 726 F.3d 372 (3d Cir. 2013)..............................42

*Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 (11th Cir. 2000) ...........................................................................................48

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159 (11th Cir. 2010)............................................................48

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)...............................................22, 23

* *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...............................*passim*

\* *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021) ................................................................................*passim*

\* *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ...........................*passim*

*United States v. Erpenbeck*, 532 F.3d 423 (6th Cir. 2008) ...................................1

*United States v. McLamb*, 880 F.3d 685 (4th Cir. 2018) ...................................15

*Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009) ....................22, 29

\* *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................*passim*

*Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857 (11th Cir. 2012) ........................................................................................................6, 32

*Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89 (2d Cir. 2017) ....................26

## CONSTITUTIONAL PROVISION:

\* U.S. Const. art. III .........................................................................*passim*

## STATUTE:

28 U.S.C. § 1292(e) ............................................................................9

28 U.S.C. § 1332(d)(2) ........................................................................9

\* 28 U.S.C. § 2072(b) ................................................................7, 41, 44

## RULES:

\* Fed R. Civ. P. 23(b)(3) ...............................................................*passim*

Fed R. Civ. P. 23(f) ............................................................................9

**OTHER AUTHORITIES:**

Amy B. Doolittle & Kristin L. Bryan, *Say It Isn't So – Court
  Certifies Rule 23(b)(3) Damages Class in Data Breach
  Litigation*, Nat. L. Rev. (Apr. 15, 2021)
  (https://tinyurl.com/2mdr73k7) ......................................................................2

William B. Rubenstein, *Newburg on Class Actions* (5th ed. 2016) ..................39

Josephine Wolff, *How Much Do Cybersecurity Breaches Really
  Cost and Why Does It Matter?*, EconoFact (Dec. 1, 2019)
  (https://tinyurl.com/6hcbyusx) ......................................................................1

**INTRODUCTION**

This appeal arises from what has unfortunately become a common occurrence: an incident in which cybercriminals, through relentless and targeted efforts, breached the internal systems of a consumer-facing business such as a retailer, hotel, or restaurant to access payment-card data.  In 2018, appellant Brinker International, Inc. ("Brinker") was the victim of such an attack, which targeted certain Brinker-owned Chili's restaurant locations.

Incidents like the one from which this case arises generally do not injure consumers.  Instead, they principally harm the targeted business—in this case Brinker—and can collaterally impose costs on payment-card issuers, which typically reimburse any fraudulent charges that occur and provide free replacement cards to the few consumers who request them.  *See*, *e.g.*, Josephine Wolff, *How Much Do Cybersecurity Breaches Really Cost and Why Does It Matter?*, EconoFact (Dec. 1, 2019) (https://tinyurl.com/6hcbyusx); *see also United States v. Erpenbeck*, 532 F.3d 423, 442 (6th Cir. 2008) (noting that consumers are "generally protected" by agreements with card issuers, which "handle any fraud based upon unauthorized charges against the customer's account" by "immediately reimburs[ing]" any such charges and "tak[ing] complete responsibility for investigating the fraud").  Accordingly, businesses targeted by such incidents

1

typically compensate card companies for any resulting inconveniences, as Brinker did here.

By contrast, because of the relative rarity of fraudulent charges and the fact that they are generally absorbed by card companies, *consumer* injury is inherently uncommon, atypical, and individualized—to the extent it occurs at all. For that reason and others, until the order now on review, no federal court had ever granted an opposed motion to certify a consumer class in a case arising from a payment-card data breach.[1] Nevertheless, shortly after Brinker was targeted, plaintiffs' counsel filed this action, seeking to represent proposed classes comprising all 4.5 million people whose payment cards were allegedly subject to the incident and claiming that those individuals suffered an increased risk of identity theft. As is often true in cases like this one, the harms alleged are trivial to the extent they occurred at all, and the damages sought are correspondingly inconsequential on an individual-class-member basis. Yet the potential size of the putative classes

---

[1]     *See*, *e.g.*, *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1340-45 (11th Cir. 2021) (affirming dismissal for lack of standing); *Beck v. McDonald*, 848 F.3d 262, 270-78 (4th Cir. 2017) (same); *McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121, at *11 (C.D. Ill. Jan. 19, 2021) (denying certification); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 30-35 (D. Me. 2013) (same). *See generally* Amy B. Doolittle & Kristin L. Bryan, *Say It Isn't So – Court Certifies Rule 23(b)(3) Damages Class in Data Breach Litigation*, Nat. L. Rev. (Apr. 15, 2021) (https://tinyurl.com/2mdr73k7) (describing order under review as "a potential game changer").

ensures that a judgment for the plaintiffs, which would materially benefit no one other than class counsel, would be crippling to the defendant and its customers if actually awarded.

As other courts have uniformly recognized in contested cases, however, the realities of consumer data-breach litigation foreclose class-action treatment. The claims plaintiffs assert demonstrate why. Plaintiffs' core theory is that, after learning that their card numbers *might* have been obtained by hackers, some still-unknown number of consumers voluntarily took actions to guard against the possibility that those card numbers *might* be misused in the future. That theory is legally untenable: It runs headlong into the Supreme Court's express holdings that neither "the mere risk of future harm," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210-11 (2021), nor "self-inflicted" harms, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013), create Article III standing for a damages suit. Indeed, this Court has clearly held that data breaches involving payment cards do not give rise to Article III standing for any consumer whose data has not in fact been "*misuse*[*d*]." *Tsao*, 986 F.3d at 1343 (emphasis added). And because the self-inflicted mitigation steps plaintiffs allege as injury are inherently individualized—that is, if they were undertaken at all, it was by particular unidentified cardholders on a non-generalizable basis—claims like those asserted here are among the many that Rule 23's "stringent requirements for certification" would "in practice

exclude," *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013), even if they were cognizable under Article III. The district court appeared to acknowledge as much, recognizing not only that no other court had ever "certif[ied] a [damages] class involving individual consumers complaining of a data breach involving payment cards," but also that "this class action" itself "is not perfectly composed." Doc.167:36.[2]

Faced with plaintiffs' request to certify two potentially massive classes (one nationwide and one for California) comprising every individual who allegedly patronized a Chili's restaurant on a date affected by the data incident, the district court recognized that the proposed classes would include untold numbers of persons with no injuries and no standing. *See* Doc.167:15-16. In an attempt to cure this inherent defect, the district court *sua sponte* modified the class definitions, limiting the classes to those "who: (1) had their data accessed by cybercriminals and, (2) incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach." *Id.* at 16. The court opined that these

---

[2]     Pursuant to Eleventh Circuit Rule 28-5, Brinker cites appendix materials by document number assigned through the district court's ECF system and pinpoint citation in the following format: Doc.[DOCUMENT NUMBER]:[PINPOINT CITATION(S)]:[LINE NUMBER(S)]. Where available, pinpoint citations refer to the page numbers generated by the ECF headers. In the case of sealed documents, for which ECF headers and page numbers are unavailable, this brief identifies the relevant documents as follows: Doc.[NUMBER] (SEALED DOCUMENT), [EXHIBIT DESIGNATION]:[PINPOINT CITATION(S)].

"clarifiers" avoided the "predominance issues regarding standing and the inclusion of uninjured individuals." *Id.* But they do not. To the contrary, in certifying the classes based on its modified definitions (which were never subjected to adversarial testing), the court committed three fundamental legal errors, each of which independently warrants reversal.

*First*, the court contravened Article III, as interpreted in *TransUnion*, *Clapper*, and *Tsao*, by purporting to find standing for millions of class members even though there is ***no*** evidence that any more than one or two of them (if even that many) actually sustained fraudulent charges, data misuse, or any other concrete harm from the incident. The court held that all cardholders "who had their data accessed by cybercriminals"—apparently defined to include any cardholder whose data may at some point have been posted for sale on the Internet's "dark web"—would have standing if they could prove they "incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach." Doc.167:12, 16. Those are precisely the sorts of speculative, individualized, risk-based, and self-inflicted claims of harm, disconnected from any fraudulent misuse, that do ***not*** confer standing under governing precedents. *See*, *e.g.*, *Tsao*, 986 F.3d at 1345. And certifying classes that sweep in many thousands or millions of members who, like the plaintiff in *Tsao*, suffered no concrete injury at all violates this Court's decision in *Cordoba v. DIRECTV, LLC*,

5

942 F.3d 1259, 1276-77 (11th Cir. 2019), which prohibits certification of classes including large numbers of uninjured plaintiffs.[3]

*Second*, even assuming *arguendo* that the "clarifiers" the district court added to the class definitions could satisfy Article III, the order contravenes *Cordoba* by certifying classes when it will be impossible to determine **which individuals** suffered those supposed injuries without conducting millions of individualized, case-by-case mini-trials. As the district court acknowledged, just to prove injury and class membership, every claimant must show, *inter alia*, that (1) his or her **particular** data was actually posted on the "dark web," and (2) he or she **personally** incurred reasonable expenses or time spent in mitigation of the consequences. Every claimant must also show, *inter alia*, that the particular mitigation activity that they claim to have engaged in was a response not just to the data incident (in which case it would be indistinguishable from the activity rejected as a basis for Article III standing in *Tsao*), but instead to the "dark web" posting specifically. Those are inherently claimant-specific, individualized issues that cannot be proven through common evidence and will instead require millions of separate evidentiary showings and jury findings. In erroneously concluding (after less than a page of

---

3    *See also*, *e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624-25 (D.C. Cir. 2019); *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012).

analysis) that classwide issues would nevertheless predominate, *cf.* Doc.167:25-26, the district court failed to consider the impossibility of litigating those individualized issues, as well as others necessary to satisfy Article III, *see infra* at 33-37, as to millions of plaintiffs one-by-one "***at trial***," as the Constitution requires. *TransUnion*, 141 S. Ct. at 2208, 2212 (emphasis added). The district court's failure to consider that archetypal predominance-defeating problem is the exact error that led to decertification in *Cordoba*, and it warrants the same result here.

*Third*, the district court violated the Rules Enabling Act and Rule 23, and misconstrued Supreme Court precedent, by concluding that it could make common issues predominate simply by awarding the same damages to each absent class member ***regardless*** of whether they suffered any corresponding injury. Rule 23 is not—and, under the Rules Enabling Act, cannot be—a mechanism for commingling the substantive rights of disparately situated plaintiffs, let alone compensating uninjured ones. *See*, *e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (citing 28 U.S.C. § 2072(b)). Yet the district court granted certification on the premise that it could award "all class members … a standard dollar amount" for each of a series of purported damages elements, even though the court itself recognized that doing so would compensate large numbers of cardholders for supposed injuries they unquestionably did not suffer. *See*

7

Doc.167:7, 32-34.  Specifically, the court proposes to achieve uniformity (and thus predominance) by awarding damages "for lost opportunities to accrue rewards points" to thousands or millions of individuals who did "***not*** … use[] a rewards card;" damages for "the value of cardholder time" spent addressing the breach to thousands or millions of individuals who did "***not*** ... spen[d] ***any*** time addressing the breach;" and "out-of-pocket damages" to thousands or millions of individuals who did "***not*** ... incur[] ***any*** out-of-pocket damages."  *Id.* (emphasis added; parentheses omitted).  By basing certification on an impermissible plan to ignore those substantial differences among class members, the order commits clear legal error and "reduce[s] Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013).

Each of those errors warrants reversal.  The order improperly certifies massive classes in which few (if any) members suffered any cognizable injury, ignores a host of individualized inquiries needed even to determine standing and class membership, and violates the rights of Brinker and absent class members by permitting a trial-by-averaging that Supreme Court precedent clearly forecloses.  It thus contravenes Article III, the Seventh Amendment right to a jury trial, the Rules Enabling Act, Rule 23, and numerous binding precedents of this Court and the Supreme Court.  This Court granted Brinker's petition for interlocutory appeal to review those errors and should now reverse.

8

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

The complaint asserts jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  All or substantially all named plaintiffs and absent class members lack Article III standing, and the district court therefore lacked subject-matter jurisdiction over their claims.  Nevertheless, this Court has jurisdiction to hear this interlocutory appeal from the district court's order granting class certification pursuant to 28 U.S.C. § 1292(e), Federal Rule of Civil Procedure 23(f), and this Court's September 16, 2021 order granting permission to appeal. *See* Order, *Brinker International, Inc. v. Steinmetz*, No. 21-90011 (11th Cir. Sept. 16, 2021).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred as a matter of law when, in contravention of *TransUnion, Clapper*, *Tsao*, *Cordoba*, and other binding precedents, it certified damages classes overwhelmingly composed of members who suffered no Article III injury.

2.      Whether the district court erred as a matter of law when, in contravention of Rule 23, *TransUnion*, *Cordoba*, and other binding authority, it certified classes that will require holding millions of mini-trials on the facts regarding each putative plaintiff's standing, class membership, and damages before judgment can be entered.

9

3.     Whether the district court erred as a matter of law when, in contravention of the Rules Enabling Act, Rule 23, and clear Supreme Court precedent, it certified classes on the premise that it could award a single, "average" amount of damages to each class member regardless of whether that individual suffered any corresponding injury.

## STATEMENT OF THE CASE

### A.     Factual Background.

During March and April of 2018, criminal hackers targeted Brinker's internal data systems and may have accessed the payment-card information of patrons at certain Brinker-owned Chili's locations.  *See* Doc.167:2.  Brinker has compensated payment-card companies as a result of that incident.  *See*, *e.g.*, Doc.146 (SEALED DOCUMENT), Ex. A-2:207:3-5 (noting that Brinker had paid a fee to MasterCard and likely paid a similar fee to Visa).  Each of the three named plaintiffs remaining in the case patronized a Chili's during the period surrounding the data incident (though, as discussed below, not necessarily during the specific windows when the particular restaurants they patronized were targeted).  They assert claims of negligence under Florida or Texas law and unfair competition

under California law, and seek to represent all individuals they claim are similarly situated.  Doc.95.[4]

In August 2019, the district court ruled on Brinker's motion to dismiss, holding, *inter alia*, that certain named plaintiffs lacked Article III standing because they alleged only that they had taken mitigation steps in response to risks the data incident supposedly created.  Specifically, the court dismissed the claims of two then-named plaintiffs (Christopher Lang and Peter Alamillo).  Lang alleged that he was harmed because his personal information was "at risk" because of the incident. Doc.65:15.  Alamillo alleged that he was harmed because, after being informed of the data breach, he purportedly spent time monitoring his financial accounts and canceling a year of free credit monitoring he had been provided.  *Id*.  The district court, explaining that "[t]o constitute a concrete injury, the risk of future harm must be certainly impending—not merely possible—and cannot be too speculative," held that the mere occurrence of the data breach was "insufficient to demonstrate a future risk of harm beyond a speculative level" as to those individuals.  *Id.* at 15, 17.  The court so held because Lang and Alamillo did "not allege that their information was actually compromised—only that it is at risk."  *Id.*

---

[4]    The district court dismissed various other claims, Doc.92, and plaintiffs have affirmatively waived any intention to pursue a nationwide class action on their claims for breach of implied contract, Doc.168.

11

at 17. Moreover, the court reasoned, the mere breach of payment-card numbers "is less likely to lead to identity theft than [breaches relating to] other types of information," and the plaintiffs' card numbers "ha[d] not actually been misused." *Id.* at 18. Further, citing *Clapper*, 568 U.S. at 409, the court held that Lang and Alamillo could not manufacture standing by invoking mitigation steps taken in response to a "threat of future injury" that did not itself suffice under Article III. *Id.* at 18. The court therefore dismissed Lang's and Alamillo's claims for lack of Article III standing, while holding that the claims of other named plaintiffs (specifically, those who alleged that they actually incurred fraudulent charges, or that they lost the opportunity to accrue rewards while awaiting replacement cards they requested) could proceed.

For the purposes of this appeal, three named plaintiffs remain in the case: Michael Franklin, Eric Steinmetz, and Shenika Theus. The facts giving rise to each of individual's claims are unique to each individual. For instance, Franklin alleges that he suffered fraudulent charges, but admitted under oath that, for reasons having nothing to do with Brinker or Chili's, his payment-card information was in the public domain months before the Brinker data incident even occurred. Doc.146 (SEALED DOCUMENT), Ex. A-8 at 202:23-203:7. Specifically, Franklin had used his card at a Whole Foods store in December 2017, during a time when Whole Foods was victimized by an unrelated data breach of its own. *Id.*

12

at 202:1-203:7.  Shortly thereafter, and before the Brinker incident, Franklin began incurring fraudulent charges.  *Id.*; *see also id.*, Ex. A-7:3.  He did not cancel his card, and instead used it later at Chili's.  *See id.*, Ex. A-8 at 202:1-203:7.

Steinmetz's circumstances are different.  As the district court recognized, Steinmetz did not experience any fraudulent charges on the payment card at issue.  Doc.167:12; *see also* Doc.146 (SEALED DOCUMENT), Ex. A-11:6; *id.*, Ex. A-12 at 41:20-142:16.  Unlike Franklin, however, Steinmetz did cancel his card after the Brinker data incident.  *Id.*, Ex. A-12 at 69:2-73:8.

Theus's circumstances are also unique.  She admits that she was reimbursed by her card company for fraudulent charges she claims to have incurred after visiting a Chili's restaurant, *id.*, Ex. A-16 at 45:13-17, but claims that due to the balances in her personal accounts at the time certain automated payments became due, the fraudulent charges she alleges also led her to suffer an overdraft fee that was not reimbursed, *id.* at 43:19-45:10.

The three named plaintiffs also allege different purchase dates that raise additional individualized issues.  Theus alleges that she patronized a Chili's location (in Garland, Texas) during that restaurant's at-risk timeframe.  Doc.167:2; Doc.95:8.  Steinmetz and Franklin, however, make no similar claim.  Steinmetz undisputedly made no purchase at any Chili's location during an at-risk timeframe for that location, but the district court concluded without analysis that the date on

which he did make a purchase was somehow "close" enough.  Doc.167:18-19.

Likewise, even though records indicate that Franklin's purchases were outside the

at-risk timeframes for the two Chili's locations Franklin patronized,[5] the district

court found that "Franklin is a part of the class" based on "the totality of the

evidence" mustered in support of his individual claim, "including the unauthorized

charges on [his] account after the breach."  Doc.167:18.  *But see supra* at 12-13

(noting that Franklin's card number had already been breached before the Brinker

incident).

> **B.     The District Court's Order And The Petition For Interlocutory**
> **Appeal.**

In April 2021, the court certified a nationwide class for the negligence

claims and a California state class for the unfair competition claims.  As to the

negligence claims, the class is defined as:

> All persons residing in the United States who made a credit or debit
> card purchase at any affected Chili's location during the period of the
> Data Breach (March and April 2018) who: (1) had their data accessed
> by cybercriminals and, (2) incurred reasonable expenses or time spent
> in mitigation of the consequences of the Data Breach.

---

5      *Compare* Doc.141-1:63 *and* Doc.146 (SEALED DOCUMENT), Ex. A-8:103 (purchases at Carson, California Chili's on March 17, 2018, and Lakewood, California Chili's on April 22, 2018) *with id.*, Ex. A-3 at 31 (Carson at-risk timeframe began March 30, 2018, and Lakewood timeframe ended April 21, 2018).

Doc.167:37.  The class definition for the unfair competition claims is substantively identical but limited to California residents.  Doc.167:37-38.

As relevant here, the certification order addressed issues regarding Article III standing and predominance under Rule 23(b)(3).  As to standing, the court concluded that this Court's decision in *Tsao*—which held that someone whose card was potentially subject to a data breach lacked standing—was inapplicable because "***Plaintiffs assert*** that all of the payment card information taken in the Data Breach is on the dark web."  Doc.167:12 (emphasis altered).  *See generally United States v. McLamb*, 880 F.3d 685, 686 (4th Cir. 2018) ("The dark web is a collection of encrypted networks providing strong privacy protections to its users.").  The district court did not cite evidence to support plaintiffs' assertion that "***all***" of the allegedly affected data was "on the dark web"; instead, the only citation the district court invoked for its finding was to unsworn, unsupported, and inadmissible attorney argument made during the class-certification hearing.  *See* Doc.167:12.  Indeed, there is no evidence that the card information of even the three named plaintiffs was on the dark web.[6]  Nevertheless, the district court

---

[6]    In their class certification motion, plaintiffs asserted that data connected with the breach at issue was "found for sale on the dark web."  Doc.131:4 & n.8.  But the only support for that assertion was a report noting that ***some***, unidentified card numbers associated with the Brinker data incident were found on a certain (now-defunct) website.  *See* Doc.167:2 (district court's citation to report's finding that unspecified "card data" associated with breach was found on "Joker's Stash" dark web site) (quoting Doc.146 (SEALED DOCUMENT), Ex. A-15:2).  That cited

concluded that every plaintiff's payment card was "accessed by cybercriminals" and that such "access[]" constituted "misuse" of every class member's data. Doc.167:10-13, 25.  The court further reasoned that such "misuse," when combined with "reasonable expenses or time spent in mitigation," established standing for every consumer.  *Id.* at 25-26.  The court did not explain why it believed such time spent in mitigation, which had been insufficient as a matter of law to establish standing for Lang and Alamillo, was now adequate.  Nor did it address the incongruence of certifying classes that would include Lang and Alamillo after having previously held that those very individuals lacked standing.

Turning to Rule 23(b)(3)'s requirement that common issues must predominate, the court acknowledged that "[i]f proving class member standing will require individualized proof, predominance is likely not satisfied."  *Id.* at 25.  The court also recognized that the standing inquiry would involve "difficult" issues relating to "self-identification" of every individual plaintiff seeking to prove injury. *Id.* at 16.  Nevertheless, the court deemed those concerns irrelevant to predominance.  *Id.* at 16, 25.  Specifically, the court believed that by *sua sponte*

---

evidence does not state that ***every*** card number potentially associated with the class was posted on that website or any other.  And when plaintiffs' counsel was asked by the court during the class certification hearing "do you know that any of your three representatives' cards were actually on the dark web available," counsel responded "we do not know that at this point."  Doc.165:26-27.

defining the class to include only cardholders whose data was "accessed by cybercriminals" and who incurred "reasonable expenses or time spent in mitigation," it could "eliminate concerns of a lack of predominance as to standing because individuals are not in the class unless they have had both their data misused and incurred reasonable expenses or wasted time." *Id.* at 16, 25. The district court did not consider, however, that, as a result of its *sua sponte* redefining of the classes, it would be impossible to determine before any judgment whether any individual is, in fact, a class member—and it would remain impossible to determine whether any individual class member was injured—without individually examining whether that person meets the new criteria.

With respect to predominance regarding causation and damages, the district court concluded that the plaintiffs' expert, Daniel Korczyk, "offers a common method of calculating damages that allows the Court to determine individual class members' damages in a non-complex and non-burdensome way." *Id.* at 32-33. As the court explained, that proposed methodology is simply to "employ[] an averages method" that allocates each form of damages asserted by ***any*** class member equally to ***every*** class member, regardless of whether that class member suffered that form of (or any) alleged injury. *Id.* at 7-8. For instance, based on the expert's estimate that 76% of people subject to the incident would have lost opportunities to accrue rewards points while replacing a card, plaintiffs propose to award a flat sum

17

to *every* class member, expressly ***including those who did not have rewards cards***, and without even demonstrating which rewards-card holders actually requested replacements.  *See* Doc.132-1:15-17, ¶¶ 40-45.

As Korczyk conceded, the result is to award a "windfall" to the many individuals who undisputedly did not suffer any supposed injury relating to card rewards—for example, those who paid with debit cards—to be paid for by a 24% average reduction in the damages available to any individual who did.  Doc.146 (SEALED DOCUMENT), Ex. A-13 at 207:16-17; Doc.132-1:17 (noting 24% reduction).  The district court acknowledged that such a method allows classwide application only by ignoring material differences among the plaintiffs (and thus reducing the damages theoretically available to some class members in order to more uniformly compensate others), but nevertheless deemed it sufficient to satisfy predominance, reasoning that "the Supreme Court has approved the use of averages methods to calculate damages."  Doc.167:7-8, 32-33 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459-61 (2016)).  The district court thus authorized plaintiffs to pursue possibly billions of dollars of classwide damages[7]

---

[7]    The plaintiffs' expert proposes to allocate $38 to every plaintiff for out-of-pocket expenses (a total of $171,000,000 for 4.5 million class members), $12 to every plaintiff for the value of information supposedly stolen (a total of $54,000,000), $2.44 to every plaintiff for the loss of opportunity to accrue rewards points (a total of $10,980,000), and $25.89 per hour for time spent addressing the data breach, with the average hours multiplier still to be determined.  *See* Doc.132-

18

without tying those claimed damages to any individual's supposed loss, without evidence that more than one or two individuals (if any) suffered even the alleged injuries the district court erroneously deemed sufficient to confer standing, and without any plan to resolve that issue through classwide proof.

After the district court certified the classes, Brinker timely petitioned this Court for interlocutory review under Rule 23(f), arguing that each of the fundamental errors described above independently warrants immediate review and reversal. Rule 23(f) Pet. at 2.[8] Plaintiffs opposed. This Court granted the petition.

## SUMMARY OF ARGUMENT

"Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *TransUnion*, 141 S. Ct. at 2208 (quoting *Tyson Foods*, 577 U.S. at 466 (Roberts, C.J., concurring)); *see also*, *e.g.*, *Cordoba*, 942 F.3d at 1274. Moreover, "[t]o obtain certification of a class action for money damages under Rule 23(b)(3)," a plaintiff must establish, *inter alia*, that "the questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,

---

1:9-10, 14-18 ¶¶ 22-24, 38, 40-41, 44, 46-47. If that multiplier exceeds 6.6, the total award could exceed $1,000,000,000.

[8] "Rule 23(f) Pet." and "Rule 23(f) Opp." refer to the Rule 23(f) petition and the opposition thereto. *See Brinker Int'l, Inc. v. Steinmetz*, 11th Cir. No. 21-90011.

568 U.S. 455, 460 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).  Predominance is a "demanding" standard that must be satisfied through "evidentiary proof." *Comcast*, 569 U.S. at 33; *see Wal-Mart*, 564 U.S. at 350-51 ("Rule 23 does not set forth a mere pleading standard," and instead requires "rigorous analysis" by the district court "before coming to rest on the certification question").  It cannot be achieved by altering parties' substantive rights or otherwise endorsing "the premise that [the defendant] will not be entitled to litigate its … defenses to individual claims."  *Wal-Mart*, 564 U.S. at 367; *see also Comcast*, 569 U.S. at 35-36.

The district court's order flouts those core requirements in at least three fundamental ways.  *First*, the court's erroneous analysis of standing led it to certify classes filled with members who cannot establish Article III standing under *TransUnion*, *Clapper*, and *Tsao*.  By failing to ask whether more than one or two of the millions of putative class members actually sustained fraudulent charges or any other misuse of their card data that could satisfy Article III in a damages suit, the Court contravened *Cordoba*'s clear holding that "a class is 'overbroad'" and cannot be certified if "it contains a great many persons who have suffered no" Article III injury.  942 F.3d at 1276.  Reversal is warranted for that reason alone.

*Second*, even assuming *arguendo* that the district court could certify classes overwhelmingly composed of uninjured members, the court committed additional legal error by failing to even consider the need to individually identify such

persons before entering judgment for any injured ones.  *See TransUnion*, 141 S. Ct. at 2208; *Cordoba*, 942 F.3d at 1276-77.  Despite acknowledging that no class member can prove injury without providing individualized evidence and testimony, much of which would be vigorously contested at trial and all of which would defeat predominance, the court attempted to circumvent Rule 23 and *Cordoba* by *sua sponte* redrafting the class definitions to simply **assume** the predominance-defeating issues in each class member's favor.  Doc.167:16.  But that adjustment to the class definitions is purely semantic and legally insufficient.  As the Supreme Court recently reemphasized, each class member's standing must be proven "**at trial**."  *TransUnion*, 141 S. Ct. at 2208 (emphasis added).  The fact that such a showing cannot be made based on common evidence—a conclusion with which the district court openly agreed—therefore defeats predominance.

*Third*, the district court erred by certifying classes on the premise that predominance could be achieved simply by treating differently situated plaintiffs alike.  The court's plan to award damages to individuals who suffered no corresponding injury blatantly contravenes the Rules Enabling Act, Rule 23, and clear Supreme Court precedent.  And plaintiffs' backtracking effort to dissociate from the district court's error by asserting (as they did in response to the petition) that Korczyk's methodology takes individual differences into account fares no better, since it is belied by the district court's express findings and, even if correct,

21

would demonstrate that individualized issues predominate.  The order should be reversed for that independent reason also.

## STANDARD OF REVIEW

Class certification orders are reviewed for abuse of discretion, but "in the context of class actions, review for abuse of discretion often does not differ greatly from review for error."  *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016) (quotation omitted).  "A district court abuses its discretion if it applies an incorrect legal standard," and "issues of law" such as those raised here are "review[ed] de novo."  *Cordoba*, 942 F.3d at 1267.  "The burden of proof to establish the propriety of class certification rests with the advocate of the class," *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009) (quotation omitted), and a plaintiff must "satisfy through evidentiary proof" compliance with Rule 23(b).  *Comcast*, 569 U.S. at 33.  If there is doubt "about whether the [class certification] standard is satisfied, the party with the burden of proof loses."  *Brown*, 817 F.3d at 1233 (quotation omitted).

## ARGUMENT

## I.    THE ORDER CONTRAVENES BINDING PRECEDENT BY CERTIFYING CLASSES THAT CONSIST ALMOST ENTIRELY OF UNINJURED MEMBERS.

Under Article III, a federal court cannot enter judgment for any plaintiff who lacks standing.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337-38 (2016).

Accordingly, before entering judgment, a court must satisfy itself that every plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 338 (citation omitted). That principle applies equally to class actions. *TransUnion*, 141 S. Ct. at 2208 (quoting *Tyson Foods*, 577 U.S. at 466 (Roberts, C.J., concurring)); *Cordoba*, 942 F.3d at 1274.

In *Tsao*, relying on well-developed precedent, this Court held that a plaintiff cannot demonstrate the constitutionally required injury merely by showing that he or she used a payment card at a business during a time when the business was subject to a data breach. 986 F.3d at 1340-44 (citing sources). Rather, *Tsao* held that plaintiffs claiming injury as a result of a data breach potentially involving their payment cards must also demonstrate specific evidence of "misuse." *Id.* at 1343-44. As the Court explained, without such evidence, the mere fact that cybercriminals had or have access to a payment-card number does not automatically give rise to Article III injury, because such criminals already have access to thousands or millions of payment-card numbers and the rate of identity theft or other misuse arising from that access is exceedingly low. *See id.* at 1343 (holding that "the risk that the hackers, if they accessed and stole Tsao's credit card information, could make unauthorized purchases with his cards or drain his accounts," did not establish a "substantial risk" of injury supporting standing); *see*

23

*also*, *e.g.*, *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 929-935 (11th Cir. 2020) (en banc). Likewise, steps taken to mitigate the risk of identity theft in response to a payment-card data breach cannot independently support standing, both because they are self-inflicted and because they are not fairly traceable to any harm that is "certainly impending." *Tsao*, 986 F.3d at 1344-45 (citing *Clapper*, 568 U.S. at 416).

These holdings in *Tsao* are consistent with the Supreme Court's later decision in *TransUnion*, although *TransUnion* raised still higher the threshold to demonstrate standing for damages. *TransUnion* examined whether misleading information in a credit bureau's files necessarily injured the individuals to whom the information pertained. The Court held that while "a risk of future harm" (there, the risk that the materials would be disseminated) may support standing to "pursue forward-looking, injunctive relief," plaintiffs seeking ***damages*** can never rely on a mere risk, even one that is certainly impending. 141 S. Ct. at 2210-11. Instead, the Court held, plaintiffs seeking damages must prove "that the risk of future harm materialized." *Id.* at 2211.[9] The Court therefore held that individuals as to whom

---

[9]    Thus, to the extent *Tsao* suggested that standing in a damages action could be based on a non-materialized "substantial risk" of harm, 986 F.3d at 1339-40, any such suggestion is no longer good law.

misleading information was never actually disseminated could not establish

standing to pursue damages. *TransUnion*, 141 S. Ct. at 2211.[10]

Moreover, *TransUnion* makes clear that even for injunctive relief, standing

will not lie unless plaintiffs affirmatively "demonstrate a sufficient likelihood" that

the feared risk will actually come to pass.  141 S. Ct. at 2212.  Thus, because

certain plaintiffs did not prove "their individual credit information would be

requested by third-party businesses and provided by TransUnion" or otherwise

released, their claims were dismissed.  *Id.*  That holding aligns with *Tsao*'s similar

holding, in the data-breach context, that the fact that a person's payment-card

number has potentially been obtained by cybercriminals is insufficient to establish

a sufficient likelihood that injury will occur.  The mere allegation that

cybercriminals may potentially have posted the information on the dark web,

which contains vast quantities of data, does not change that analysis.  *See infra* at

27-28.

Other courts have also recognized that, without more, payment-card data

breaches do not give rise to consumer injury.  Indeed, the Second Circuit recently

---

10     Some *TransUnion* plaintiffs proved harm because TransUnion disseminated
misleading information to parties running credit checks, thereby defaming those
plaintiffs.  *TransUnion*, 141 S. Ct. at 2208-09.  Here, plaintiffs did not (and could
not) demonstrate any analogous injury.  Moreover, *Tsao* holds that mere
dissemination of credit card information (as opposed to the defamatory materials in
*TransUnion*) cannot confer standing absent fraudulent misuse.

rejected claims of standing even in a case that, unlike this one, involved the actual disclosure to third parties of sensitive, "high-risk" *personal* information, such as "Social Security numbers, home addresses, dates of birth, telephone numbers, educational degrees, and dates of hire." *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 298, 302 (2d Cir. 2021).  In so doing, that court approvingly cited some of the litany of cases rejecting claims of standing in the payment-card context, noting that "the nature of" payment-card "data itself reveals that plaintiffs are not substantially at risk of identity theft," because such information is "less sensitive" than personal data and "can be rendered useless to cybercriminals." *Id.* at 302, 304 n.6 (citing *In re Supervalu, Inc.*, 870 F.3d 763, 770 (8th Cir. 2017); *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89, 90 (2d Cir. 2017)); *see supra* at 1-2.[11]

Despite this clear authority, the district court held that all cardholders "who had their data accessed by cybercriminals"—which the court suggested would include anyone whose data was at some point on the Internet's "dark web"—have standing provided they can prove they "incurred reasonable expenses or time spent

---

[11]    This Court acknowledged the same distinction in *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247, 1262 (11th Cir. 2021), which involved the theft of a "colossal amount of sensitive data … including Social Security numbers, names, and dates of birth," although that case's core holding that "a *risk* of" fraud based on such a theft can give rise to standing for damages is no longer good law in light of *TransUnion*.

in mitigation of the consequences of the Data Breach." Doc.167:12, 16. That holding—the first of its kind—cannot be reconciled with *TransUnion* or *Tsao*. Merely having one's data ***accessed*** by cybercriminals, whether through a restaurant's point of sale system (as in *Tsao*) or on the "dark web" internet, is not "misuse" under *Tsao*'s detailed framework. *See* 986 F.3d at 1340-44. A card cannot be "***mis***used" when there is no evidence that it was ever "used" at all. *Cf. id.* at 1343 (making clear that "misuse" of card numbers refers to "unauthorized charges … or account draining"); *see also Reilly v. Ceridian Corp.,* 664 F.3d 38, 45 (3d Cir. 2011) (holding that "[i]n data breach cases where no misuse is alleged … there has been no injury").

Moreover, this Court in *Tsao* held that "[w]e are persuaded by the reasoning of the Eighth Circuit in *SuperValu*, and the facts of that case map closely to the facts of this one." *Tsao*, 986 F.3d at 1343. In *SuperValu*, the plaintiffs had attempted to argue that their card number information had been "misused" based on allegations that "illicit websites are selling their Card Information to counterfeiters and fraudsters." 870 F.3d at 770. But the Eighth Circuit soundly rejected that argument, holding that "[n]ot only are these allegations speculative, they also fail to allege any injury to 'the plaintiff[s].'" *Id.* (alterations original; quotation omitted). Rather, as the Eighth Circuit held, these allegations showed only that the plaintiffs' "Card Information was stolen by hackers … , ***but not that***

27

*it was misused*." *Id.* (emphasis added). The same is true here. Plaintiffs likewise allege (but, as shown below, have not proven) that, at one time, an "illicit website[] [was] selling their Card Information to counterfeiters and fraudsters." *Id.* But under the Eighth Circuit's reasoning—which this Court in *Tsao* expressly found persuasive, 986 F.3d at 1343—this mere allegation, even if proven, would not demonstrate that plaintiffs' card information was "misused" in any way that would confer standing.

In any event, the district court's unsupported "dark web" finding is itself reversible error. As the Supreme Court and this Court have repeatedly made clear, findings supporting class certification must be based on "evidentiary proof," not mere say-so or presumptions. *Comcast*, 569 U.S. at 33-34; *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000) (at class certification stage, the standing inquiry "is necessarily fact-specific and requires factual proffers, through affidavits and other evidentiary documents"). For instance, in *Wal-Mart*, the Supreme Court reversed class certification where plaintiffs failed to support their allegations of a common corporate policy with actual, admissible evidence, holding that "Rule 23 does not set forth a mere pleading standard," and instead requires a named plaintiff "to ***prove***" compliance with Rule 23. 564 U.S. at 350 (emphasis added).

No such proof is present here.  As noted above, there is no record evidence to support a finding that information regarding **all** payment cards subject to the Brinker incident—rather than merely an indeterminate number of them—appeared on the "dark web."  *See supra* at 15 & n.6.  Attorney argument made during the class-certification hearing is not evidence.  *Cf.* Doc.167:12.  And setting aside the inadmissible, self-contradicted attorney argument on which the district court relied, the only record evidence that is even arguably relevant is a report indicating that **some unspecified amount** of card data associated with the incident appeared at some point on the "Joker's Stash" dark web site.  *See supra* at 15 n.6.  Plaintiffs did not even try to prove that even their own card numbers, much less each of the alleged 4.5 million card numbers at issue, could be found there.

Nor can *TransUnion* and *Tsao* be distinguished by the district court's added requirement that a plaintiff have "incurred reasonable expenses or time spent in mitigation" in order to be part of the classes.  Doc.167:16.  To begin with, the district court did not even analyze whether classes limited to individuals who actually did so—possibly just a handful of people—could actually satisfy Rule 23's requirements.  *Compare*, *e.g.*, *id.* at 19-20 (deeming Rule 23's numerosity requirement satisfied based on supposed number of allegedly "compromised cards," without regard to mitigation) *with*, *e.g.*, *Vega*, 564 F.3d at 1267 (decertifying class where trial court failed to analyze whether "the class ***actually***

29

*certified* meets the numerosity requirement") (emphasis added).  And in any event, as *Tsao* holds, 986 F.3d at 1344-45, such conduct is archetypal self-inflicted harm and cannot create Article III injury, particularly when it is undertaken in response to a "non-imminent" threat.  If plaintiffs' card numbers were never "misuse[d]"— which *Tsao* and *TransUnion* require to prove Article III injury in this context— plaintiffs could not bestow standing on themselves by taking voluntary action out of a fear of non-impending future harm.  *Clapper*, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

Indeed, even the named plaintiffs make allegations that are materially identical to those this Court held were insufficient in *Tsao*.  For example, named plaintiff Steinmetz merely alleged that he used a card at a Chili's "very close to the affected time frame" for that restaurant, then canceled his card despite having experienced no fraudulent charges, and with no evidence that his payment-card number was actually posted on the "dark web," much less that his cancellation of the card had anything to do with such a posting.  Doc.167:18-19; *see also supra* at 13.  That is the precise self-inflicted claim of injury this Court held cannot satisfy Article III.  *Tsao*, 986 F.3d at 1344-45.

Moreover, as noted, the district court itself previously, and correctly, dismissed the claims of then-named plaintiffs Lang and Alamillo for lack of standing based on the same claimed injury the certification order now approves. *See supra* at 11-12; Doc.65:14, 17-18 (dismissing plaintiffs because they did "not allege that their information was actually compromised—only that it is at risk" and because mere breach of credit card numbers "is less likely to lead to identity theft than other types of information and it has not actually been misused, the threat of future injury, although possible, is not 'certainly impending'"). Those dismissed plaintiffs now fit squarely *within* the certified classes. That result is nonsensical, and the reasoning that led to it is erroneous.

In fact, to the extent their members can be identified at all, the classes are likely composed almost entirely of individuals who are similarly uninjured as Steinmetz, Lang, and Alamillo. Neither class contains any requirement that class members have suffered fraudulent charges or other misuse of their personal information, and there is no evidence even suggesting that more than a couple of individuals (if even that many) did.[12]  Indeed, there is nothing about the facts here

---

[12]    Nor could the district court have certified a class consisting only of people who experienced unauthorized charges or other fraudulent misuse as a result of the Brinker data incident, because determining who would be in that hypothetical class would likewise involve resolving millions of highly individualized inquiries that would predominate over any common issues.

that would make identity theft any more likely for class members than it was for the plaintiff in *Tsao*. Accordingly, if any class members who did not suffer identity theft, unauthorized charges, account draining, or any other similar data misuse decided to cancel a credit card or engage in other unilateral so-called mitigation efforts, that conduct would be no more attributable to Brinker than the *Tsao* plaintiff's decision was to the defendant there.

The district court's certification of classes encompassing many thousands or millions of members who lack standing requires reversal. Even assuming *arguendo* that it could be permissible to certify a class that potentially includes **some** uninjured members, *but see*, *e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing."), this Court has made clear that a class "contain[ing] **a great many** persons who have suffered no injury at the hands of the defendant" is "**overbroad**" and a "**powerful problem under Rule 23(b)(3)'s predominance factor**," *Cordoba*, 942 F.3d at 1273-76 (quotation omitted; first emphasis original); *see also Walewski*, 502 F. App'x at 861 (class "impermissibly include[d] members who have no cause of action"). Other circuits to address the issue have held the same.[13] The district court therefore clearly erred when, based on its

---

[13]    *See, e.g.*, *Rail Freight Fuel*, 934 F.3d at 624-25 (affirming district court's finding that class could not be certified because presence of roughly 2,000 uninjured class members was more than *de minimis*); *Oshana v. Coca-Cola Co.*,

misapplication of *Tsao* and failure to follow *Cordoba*, it certified classes composed entirely or almost entirely of uninjured plaintiffs.

## II. THE ORDER CONTRAVENES *TRANSUNION* AND *CORDOBA* BY IGNORING THE NEED TO CONDUCT MILLIONS OF MINI-TRIALS ON CONTESTED, INDIVIDUALIZED ISSUES.

Independent of the fact that the classes as certified consist largely or exclusively of uninjured individuals, the order also should be reversed because it fails even to consider, let alone rigorously analyze, "whether the individualized issue of standing will predominate over the common issues in the case." *Cordoba*, 942 F.3d at 1277. In *Cordoba*, this Court decertified a class because each absent litigant would "likely have to provide some individualized proof that they have standing," and there was "no indication … that the district court considered this real-world problem" in determining that common issues predominated. *Id.* at 1275.

The district court committed the same error here. In an effort to cure the overbroad class definitions by including only those cardholders who incurred reasonable expenses or spent time dealing with the data incident, Doc.167:37-38, the order requires every individual putative class member to come forward with evidence substantiating his or her claimed reasonable expenses or time spent in

---

472 F.3d 506, 514 (7th Cir. 2006) (affirming denial of certification when "[c]ountless members of [the] putative class could not show any damage" resulting from the defendant's action").

mitigation just to prove membership in a class.  The district court acknowledged that those questions present individualized issues requiring "self-identification" by plaintiffs, thus making "ascertaining the class more difficult."  *Id.* at 16.  But the district court failed to recognize that the Constitution requires that Brinker be permitted to challenge ***at trial*** every individual plaintiff's evidentiary showing. *TransUnion*, 141 S. Ct. at 2202, 2208, 2212 (evidence regarding standing for ***all*** "members of the class" must be presented "***at trial***") (emphasis added); *Wal-Mart*, 564 U.S. at 367.[14]  As noted, *see supra* at 1-2, it is highly unlikely that any significant number of the alleged 4.5 million people whose card numbers were potentially subject to the Brinker incident experienced any unreimbursed fraudulent charges or took any compensable actions at all.  But whatever the actual number of such people and the specific actions they took or experienced, those are precisely the sorts of highly individualized evidentiary proof issues that preclude class certification under *Cordoba*.

And the individualized issues the district court expressly identified are just the beginning.  Even where an individual alleges fraudulent charges or mitigation, the inquiries into causation, traceability, and other issues will be inherently and

---

14    The plaintiffs' own expert conceded as much at his deposition, acknowledging that class members cannot "get rich on exaggerating hours" spent on mitigation because "[i]t has got to be under sworn testimony.  It has to be accurate."  *See* Doc.146 (SEALED DOCUMENT), Ex.A-13 at 198:23-199:4.

pervasively individualized. Named plaintiff Michael Franklin's case demonstrates the point. Franklin experienced fraudulent charges long before the time when he claims the Brinker data incident compromised his card. *See supra* at 12-13. Those charges were likely the result of an earlier, unrelated 2017 Whole Foods data breach, and he admits his card number was compromised long before the Brinker incident even occurred. *Id.* The fact that Mr. Franklin's fraudulent charges stem from the Whole Foods incident—and not the Brinker incident—is made all the more likely because his bank statements demonstrate that Mr. Franklin did not even patronize a Chili's during the relevant at-risk timeframe for that location. *See supra* at 14. But discovering these individual-case-dispositive facts required Brinker to propound interrogatories and take multiple depositions ***specific to Franklin's individual claim***. That sort of intensely individualized inquiry would have to be multiplied millions of times to determine who is a member of the district court's classes, who would have standing, and who would ultimately be able to recover any compensable damages.

Similarly, given *Tsao*'s core holding that reacting to a data breach alone is not injury, any plaintiffs hoping to satisfy even the district court's flawed conception of standing will also have to demonstrate that their mitigation efforts were specifically in response to their supposed knowledge that their information appeared on the "dark web," rather than to their knowledge of the Brinker data

incident alone.  If absent class members took mitigation efforts merely because they were notified that their card numbers were potentially subject to the Brinker data incident, their circumstances would be identical to those of the plaintiff in *Tsao*, whom this Court held lacked standing.  Put differently, even if the district court's purported "dark web" finding were evidence-based and a basis on which to distinguish *Tsao* (and, for the reasons explained, it is neither), it would be relevant only to individuals who took actions specifically because they were informed their data was posted on the "dark web."  Yet just as in the analogous circumstances presented in *TransUnion*, there is no evidence that **any** plaintiff even knew of the alleged "dark web" posting, much less took mitigation steps based on such knowledge.  *See TransUnion*, 141 S. Ct. at 2212 ("It is difficult to see how a risk of future harm could supply the basis for a plaintiff's standing when the plaintiff did not even know that there was a risk of future harm.").  And in any event, the subjective state of mind of each plaintiff when the claimed mitigation steps were taken clearly presents a contestable jury question as to each of them that must be resolved ***at trial***.  That issue alone forecloses any finding that common issues predominate.

The district court's requirement that every class member prove that they "had their data accessed by cybercriminals" in order to be a member of the class, Doc.167:37, also creates an additional individualized inquiry that will necessarily

predominate over any common issues. As noted above, even if merely having one's card number placed on the "dark web" could confer standing (and again, for the reasons explained, it cannot), there is no evidence that *every* putative class member's number was posted there. *See supra* at 15 & n.6, 29. Nor have plaintiffs even attempted to show any other method by which it could be determined through common evidence which individual cardholders "had their data accessed by cybercriminals." Accordingly, to establish membership in the class, and again to establish injury at trial, each individual class member will have to demonstrate that fact through evidentiary proof. That, too, would require millions of separate mini-trials.

The district court ignored these glaring problems. Despite recognizing that "[i]f proving class member standing will require individualized proof, predominance is likely not satisfied," Doc.167:25 (citing *Cordoba*, 942 F.3d at 1277), the court spent less than a page on the issue and did not even consider that before awarding relief, both it and the jury would need to resolve individualized factual questions as to millions of putative claimants regarding, at a bare minimum, whether each of them experienced fraudulent charges or spent time or money in mitigation. That is the quintessential predominance problem, because the only way to resolve such issues would be to "line [up] thousands [or, in this case, millions] of class members waiting their turn to offer testimony and evidence," or to

"attempt to eliminate [that] inefficiency by presuming to do away with the rights [Brinker] would customarily have to raise plausible individual challenges" as to each plaintiff. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51-52 (1st Cir. 2018); *see also*, *e.g.*, *Rail Freight Fuel*, 934 F.3d at 627. Neither approach can be squared with Rule 23 or the Rules Enabling Act.

The district court's only response to *Cordoba* was to propose that by conditioning ***membership in the class*** on having satisfied the individualized inquiries set forth above, it was avoiding—rather than committing—the error *Cordoba* identified. Doc.167:25. That is no response at all. As *TransUnion* makes clear, "[e]very class member must have Article III standing in order to recover individual damages," and "standing 'must be supported adequately by the evidence adduced ***at trial***.'" 141 S. Ct. at 2208 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (emphasis added).[15] Thus, to obtain certification, plaintiffs were required to demonstrate that they can prove ***at trial***, through uniform classwide evidence, that each individual class member was actually injured. The court's modified class definitions do nothing to support such

---

[15]    In *TransUnion*, a plaintiff class alleged they had been injured because their credit reports contained defamatory information. But certain class members' claims failed because their Article III injuries turned on whether their credit reports "were actually sent to third-party businesses," and plaintiffs did not satisfy their "burden to prove" that fact "at trial." *Id.* at 2212.

a showing. And even if, contrary to *TransUnion*'s binding holding, the question of injury could somehow be resolved outside the trial process, conducting millions of individualized inquiries to determine who is part of each class is no more appropriate or consistent with Rule 23(b)(3)'s demanding predominance requirement than conducting millions of individualized inquiries to determine which class members were injured. *Cf. Asacol*, 907 F.3d at 51-52; *Rail Freight Fuel*, 934 F.3d at 627. If individualized factual inquiries will predominate before judgment can be granted, it makes no legal or logical difference whether those inquiries are required to determine whether a plaintiff is a member of the class in the first place or whether the plaintiff is entitled to prevail on the merits.

In fact, by embedding concededly individualized issues of injury into the class definitions, the district court exacerbated the certification order's already fatal flaws. As *Cordoba* explains, defining class membership to be coextensive with injury gives rise to a "so-called 'fail-safe' class[], whose membership can only be determined after the entire case has been litigated and the court can determine who actually suffered an injury." 942 F.3d at 1277 (citing 1 William B. Rubenstein, *Newburg on Class Actions* § 2:3 (5th ed. 2016)). The creation of such a class is itself reversible error for numerous reasons. *See, e.g.*, *Orduno v. Pietrzak*, 932 F.3d 710, 716-717 (8th Cir. 2019); *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011); Rubenstein, *supra*, §§ 2:3, 3:6. The modern iteration of

Rule 23 was drafted "specifically" to eliminate the "unfair[ness]" that results from failing "to assure that members of the class would be identified *before* trial on the merits." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974) (emphasis added). The order flouts that requirement by conditioning class membership on a fundamentally merits-based inquiry, such that any plaintiff who fails to make the required showing would be excluded from the classes and not bound by the judgment. Such a person would then be free to sue Brinker again on the exact same claim. Such a procedure "is strikingly unfair," *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1058 (7th Cir. 2016), and provides yet another reason why the district court's effort to end-run *Cordoba* and the predominance inquiry was reversible legal error.

## III. THE ORDER'S "AVERAGING" PROPOSAL VIOLATES THE RULES ENABLING ACT AND RULE 23 AND CONTRAVENES CLEAR SUPREME COURT PRECEDENT.

The district court also concluded that plaintiffs' proposed damages methodology permissibly eliminated individualized issues, thus causing common issues to predominate. *See* Doc.167:32-34. That too was reversible legal error. As the district court found, the proposed methodology is a simple "averages calculation," which attributes to each class member "a standard dollar amount" for each of a series of so-called damages elements, *even if it is undisputed that the plaintiff suffered no corresponding injury*. *Id.* at 7. Accordingly, the district

court's stated plan is to award "all class members" the same amount "for lost opportunities to accrue rewards points *whether or not they used a rewards card*, the value of cardholder time *whether or not they spent any time addressing the breach*, and out-of-pocket damages *whether or not they incurred out-of-pocket damages*." *Id.* (emphasis added; parentheses omitted).

The Supreme Court has repeatedly emphasized the unlawfulness of such an approach. In *Wal-Mart*, the Court expressly rejected a proposed method of "Trial by Formula" whereby the percentage of valid claims established from a representative subset "would be multiplied by the average [damages] award in the sample set to arrive at the entire class recovery." 564 U.S. at 367. The Court held that "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" a class could not be certified "on the premise" that the defendant would not be entitled to litigate "defenses to individual claims." *Id.* (quoting 28 U.S.C. § 2072(b)). The Court then reiterated that holding in *Comcast*, specifically rejecting the use of a model that "failed to measure damages resulting from" the particular injury alleged. 569 U.S. at 36. As the Court noted, a failure to tie damages to the actual injury a plaintiff suffered "would reduce Rule 23(b)(3)'s predominance requirement to a nullity" by rendering "*any* method of measurement ... acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 35-36.

The Court made the point again in *Tyson Foods*. Although the district court here interpreted that case as establishing that plaintiffs and courts have *carte blanche* to "use … averages methods to calculate damages" in all circumstances, Doc.167:7-8, 33, *Tyson Foods* says nothing of the sort. Instead, it explains that, in accord with *Wal-Mart* and *Comcast*, the use of representative evidence is permissible *only* if that evidence "could have been used to establish liability in an individual [case]," *and* its use would "not deprive [the defendant] of its ability to litigate individual defenses." 577 U.S. at 457-58. As the Court put it, permitting plaintiffs to rely on aggregate evidence merely because a case is brought under Rule 23 "would ... violate[] the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Id.* at 458.

Here, no one in this litigation has suggested—and the district court did not find—that in an individual action in which Rule 23 was not invoked, a plaintiff who *never* had a reward card could recover "missing reward card" damages, or a plaintiff who *never* spent time addressing a data breach could recover "time spent addressing a data breach" damages, or a plaintiff who *did not* suffer out-of-pocket loss could recover out-of-pocket damages. The mere fact that this is a putative class action cannot change that analysis. *See id.*; *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 385-86 (3d Cir. 2013). Moreover, because the questions of whether any

42

given class member *actually* possessed a reward card, *actually* spent time addressing a data breach, or *actually* suffered out-of-pocket loss are readily answerable through individualized examination, Brinker is entitled to scrutinize each individual claim *at trial* by referring to each individual class member's individual circumstances, thus defeating predominance.  *See*, *e.g.*, *Asacol*, 907 F.3d at 51-52; *see also*, *e.g.*, *Robinson v. Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 423-24 (5th Cir. 2004).  Just to cite one example, named plaintiff Franklin admitted that he did not use a reward card to make a purchase at Chili's, Doc.146 (SEALED DOCUMENT), Ex. A-10 at 27:9-28:5—a fact that required multiple depositions for Brinker to confirm, *see* Doc.141:15 n.13—yet the district court allowed him not only to remain in a class but to represent it.  The court's plan to "deprive" Brinker "of its ability to litigate individual defenses" such as that one in the interest of certifying classes clearly contravenes the Seventh Amendment's right to trial by jury, the Rules Enabling Act, and Rule 23.  *Tyson Foods*, 557 U.S. at 457; *see also Wal-Mart*, 564 U.S. at 367; *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 471-72 (1962).[16]

---

[16]    In addition to violating Brinker's rights, the proposal to "average" damages across the classes also lowers the potential recoveries of some absent class members and awards that money to others, solely in an effort to artificially achieve predominance.  That is a quintessential Rules Enabling Act violation.  If the only way to certify a class is to "abridge … or modify" the "substantive right[s]" of

The district court's suggestion that *Tyson Foods* implies otherwise is erroneous. That case involved compensation for time workers spent donning and doffing required protective equipment, and representative evidence was permissible only because "each employee worked in the same facility, did similar work, and was paid under the same policy," such that "the experiences of a subset of employees" were "probative as to the experiences of all of them." 577 U.S. at 454, 459. As other courts have since reiterated, that "unique labor situation" presents a circumstance "in which, often due to inadequate record keeping [by employers], 'a representative sample [of employees] may be the only feasible way [for an employee] to establish liability'" even in an individual suit. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020) (quoting *Tyson Foods*, 136 S. Ct. at 1040 (syllabus)). Moreover, because no individualized evidence of hours worked exists in that circumstance, no individualized defense based on such evidence could be asserted. *Tyson Foods*, 577 U.S. at 457 (holding that "[r]eliance on [the] study did not deprive petitioner of its ability to litigate individual defenses" because "there were no alternative means for the employees to establish their hours worked"). Here, by contrast, the relevant facts—whether a given class member used a rewards card, spent time addressing a data breach, or

---

absent class members, 28 U.S.C. § 2072(b), a class cannot be certified. *Tyson Foods*, 577 U.S. at 455.

suffered out-of-pocket loss—are readily ascertainable on an individualized basis.
Accordingly, resorting to the demonstrably and concededly inaccurate "averaging"
that Korczyk and class counsel propose is legally impermissible and reversible
error both because such evidence could not be admitted in an individual suit and
because, even assuming *arguendo* that it could, employing it in a class action
would deprive Brinker of its ability to litigate individual defenses.[17]

Indeed, the district court's endorsement of plaintiffs' "averaging"
methodology as a means of satisfying predominance highlights the certification
order's fundamental incoherence.  In the hope of avoiding the overwhelming
individualized issues that would predominate just to determine which individuals
(if any) have standing, the district court claimed to condition membership in the
classes on a finding that each member "incurred reasonable expenses or time spent
in mitigation of the consequences of the Data Breach."  Doc.167:37-38.  But at the
same time, the court endorsed a fatally defective damages methodology that would
award ***every*** putative class member the same amount, regardless of whether that

---

17    In *Tyson Foods*, the Supreme Court expressly declined to consider whether
the presence of uninjured class members defeated certification, instead concluding
that the defendants had abandoned that issue in their merits briefing.  *See* 577 U.S.
at 460.  Here, Brinker has squarely argued that the class should not have been
certified because there is no evidence that any appreciable number of absent class
members in fact suffered the injuries identified by the district court, which are
themselves insufficient to establish standing.  *See supra* at 22-33.

45

putative class member in fact incurred *any* expenses or time in mitigation. Thus, on the one hand, the court required a showing of supposed injury in order to prove membership in the class (a showing that, as explained above, does not satisfy Article III requirements and defeats predominance). But on the other hand, the court proposed to compensate *everyone* whose payment card was potentially subject to the breach, regardless of whether that person suffered any injury at all even under the court's flawed rulings. *See also supra* at 29-30 (noting district court's failure to conduct required Rule 23 analysis for classes as certified).

At the petition stage, plaintiffs did not even attempt to defend the district court's erroneous reasoning. Instead, they argued that the court's plan to equally compensate all class members "whether or not" they could claim corresponding injury, Doc.167:7, was merely a "summary" of Brinker's arguments. Rule 23(f) Opp. 16-17. But the order refutes that contention. The court expressly stated that the procedure was "Korczyk's damages methodology," Doc.167:7, not merely Brinker's summary of it. And far from holding that the methodology was impermissible, the court repeatedly lauded the above-described attributes as desirable, reasoning that the proposed "averages method" that "Korczyk employs" is "non-complex," "non-burdensome," and "do[es] not require individualized proof." *Id.* at 32-33. The district court thus clearly rested its predominance analysis on the erroneous premise that it could permissibly award damages based

on an average across the class, even when that average reflected injuries many class members undisputedly did not suffer.

In any event, plaintiffs' efforts to avoid the order's actual reasoning are self-defeating. Even assuming—contrary to the district court's clear and unambiguous statements—that Korczyk's methodology would compensate "*only* class members who spent time responding to the data breach" or "who incurred out-of-pocket expenses," Rule 23(f) Opp. 16-17, that would merely show that assessing injury and damages will require *another* 4.5 million individualized trials, this time to determine, among other things, the actual amount of time or expenses each class member spent on mitigation and whether such time or expenses were in fact caused by the Brinker data incident as opposed to some other, unrelated data breach or other cause. That is the opposite of the basis on which the district court deemed predominance satisfied, *see* Doc.167:33 ("[D]amages do not require significant individualized proof such that individual questions predominate over common ones."); indeed, when the district court *sua sponte* redefined the classes, it was in an ultimately futile effort to avoid precisely those inquiries. *Id.* at 25. As explained, payment-card data breaches do not give rise to widespread or uniform consumer injuries. *See supra* at 1-2. For that simple, widely recognized reason, the putative class members here are disparately situated (to the limited extent any are injured at all), and no amount of creative work by Korczyk or any other expert

can make it otherwise. "The idea that individual injury could be settled on a class-wide basis is preposterous." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1239 (11th Cir. 2000).[18] The claims asserted here are therefore among the many that are not suitable for class-action treatment under Rule 23. *See Italian Colors*, 570 U.S. at 234 ("The Rule imposes stringent requirements for certification that in practice exclude most claims."). The district court's contrary conclusion rests on clear legal errors and should be reversed.

---

[18]    *See also*, *e.g.*, *Brown*, 817 F.3d at 1240 ("[I]ndividual damages defeat predominance if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable.") (alteration added; quotation omitted); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) ("If after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, [their] claims are not suitable for class certification under Rule 23(b)(3).") (alteration original; quotation omitted).

## CONCLUSION

The Court should reverse the order and decertify the classes.

Respectfully submitted,

*/s/ Jonathan S. Franklin*
Jonathan S. Franklin
Peter B. Siegal
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466
jonathan.franklin@nortonrosefulbright.com

Jason K. Fagelman
Barton W. Cox
Philip A. Tarpley
Sarah Cornelia
NORTON ROSE FULBRIGHT US LLP
220 Ross Avenue, Suite 3600
Dallas, TX 75201
(214) 855-8000

November 16, 2021                 *Counsel for Appellant*

49

## CERTIFICATE OF COMPLIANCE
## WITH WORD VOLUME LIMITATION

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,402 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), and all requirements of 11th Cir. R. 32-3, because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in double-spaced, 14-point Times New Roman typeface.

*/s/ Jonathan S. Franklin*
Jonathan S. Franklin

November 16, 2021                    *Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2021, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system, which served the document by email on counsel for all parties.


*/s/ Jonathan S. Franklin*
Jonathan S. Franklin

November 16, 2021                    *Counsel for Appellant*