No. 21-13146

IN THE
# United States Court of Appeals for the Eleventh Circuit

---

ERIC STEINMETZ; MICHAEL FRANKLIN; AND SHENIKA THEUS,
*individually and on behalf of all others similarly situated*,

Plaintiffs-Appellees,

v.

BRINKER INTERNATIONAL, INC.,

Defendant-Appellant.

---

On Fed. R. Civ. P. 23(f) Appeal from the
United States District Court for the Middle District of Florida
in Case No. 3:18-cv-00686-TJC-MCR (Corrigan, J.)

---

## APPELLANT'S PETITION FOR PANEL OR *EN BANC* REHEARING

---

JASON K. FAGELMAN
NORTON ROSE FULBRIGHT US LLP
220 Ross Avenue, Suite 3600
Dallas, TX 75201
(214) 855-8000

JONATHAN S. FRANKLIN
PETER B. SIEGAL
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466
jonathan.franklin@nortonrosefulbright.com

*Counsel for Appellant
Brinker International, Inc.*

August 15, 2023

Steinmetz, *et al*. v. Brinker International, Inc.; No. 21-13146

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Cir. R. 26.1-2(b), Appellant Brinker International, Inc. hereby certifies that upon information and belief, the following persons and entities have an interest in the outcome of this case.

1.   Ahdoot & Wolfson, PC (counsel for Plaintiffs/Appellees)

2.   Alamillo, Peter (former Plaintiff)

3.   Amador, Angelo I. (counsel for Amicus Curiae Restaurant Law Center)

4.   Anderson, Jaclyn L. (counsel for Plaintiffs/Appellees)

5.   Barthle, Patrick A. (counsel for Plaintiffs/Appellees)

6.   Brinker International, Inc.; NYSE:EAT (Defendant/Appellant)

7.   Chamber of Commerce of the United States of America (Amicus Curiae)

8.   Clark, Miles (counsel for Plaintiffs/Appellees)

9.   Cornelia, Sarah B. (counsel for Defendant/Appellant)

10.  Corrigan, Hon. Timothy J. (U.S. District Court Chief Judge in originating court)

11.  Cox, Barton W. (counsel for Defendant/Appellant)

12. Cozen O'Connor (counsel for Amici Curiae Restaurant Law Center, Retail Litigation Center, Inc., and National Retail Federation)

13. Dickey, Gilbert C. (former counsel for Amicus Curiae Chamber of Commerce of the United States of America)

14. Dickey, Jennifer B. (counsel for Amicus Curiae Chamber of Commerce of the United States of America)

15. Fagelman, Jason K. (counsel for Defendant/Appellant)

16. Federman, William B. (counsel for Plaintiffs/Appellees)

17. Federman & Sherwood (counsel for Plaintiffs/Appellees)

18. Fitzgerald, Matthew A. (counsel for Amicus Curiae Chamber of Commerce of the United States of America)

19. Franklin, Jonathan S. (counsel for Defendant/Appellant)

20. Franklin, Michael (Plaintiff/Appellee)

21. Fuller, Daniel (counsel for Defendant/Appellant)

22. Green, Christopher (counsel for Defendant/Appellant)

23. Green-Cooper, Marlene (former Plaintiff)

24. Hannon, Kevin S. (counsel for Plaintiffs/Appellees)

25. The Hannon Law Firm, LLC (counsel for Plaintiffs/Appellees)

26. Hendrix, Nicholas (former counsel for Defendant/Appellant)

27.  Kaplan, Max E. (counsel for Amici Curiae Restaurant Law Center, Retail Litigation Center, Inc., and National Retail Federation)

28.  Kasdan Turner Thompson Booth LLP (former counsel for Plaintiffs/Appellees)

29.  Kester, Francesca (counsel for Plaintiffs/Appellees)

30.  Knepper & Clark, LLC (counsel for Plaintiffs/Appellees)

31.  Lang, Christopher (former Plaintiff)

32.  Lawrence, Brian Christopher (counsel for Defendant/Appellant)

33.  LippSmith, Graham B. (counsel for Plaintiffs/Appellees)

34.  LippSmith, MaryBeth (counsel for Plaintiffs/Appellees)

35.  LippSmith LLP (counsel for Plaintiffs/Appellees)

36.  Lowndes, Drosdick, Doster, Kantor & Reed, PA (counsel for Defendant/Appellant)

37.  Martin, Jean Sutton (counsel for Plaintiffs/Appellees)

38.  Martz, Stephanie (counsel for Amicus Curiae National Retail Federation)

39.  McCune Wright Arevalo, APC (counsel for Plaintiffs/Appellees)

40.  McGuireWoods LLP (counsel for Amicus Curiae Chamber of Commerce of the United States of America)

Steinmetz, *et al.* v. Brinker International, Inc.; No. 21-13146

41.   McTigue Jr., Michael W. (counsel for Amici Curiae Restaurant Law Center, Retail Litigation Center, Inc., and National Retail Federation)

42.   Morgan & Morgan, PA (counsel for Plaintiffs/Appellees)

43.   National Retail Federation (Amicus Curiae)

44.   Norton Rose Fulbright US LLP (counsel for Defendant/Appellant)

45.   Perez, Frank A. (counsel for Plaintiffs/Appellees)

46.   Reddy, Kenya (counsel for Plaintiffs-Appellees)

47.   Restaurant Law Center (Amicus Curiae)

48.   Retail Litigation Center, Inc. (Amicus Curiae)

49.   Richardson, Hon. Monte C. (U.S. Magistrate Judge in originating court)

50.   Sanders, Fred (former Plaintiff)

51.   Sauder, Joseph G. (counsel for Plaintiffs/Appellees)

52.   Sauder Schelkopf, LLC (counsel for Plaintiffs/Appellees)

53.   Siegal, Peter B. (counsel for Defendant/Appellant)

54.   Slawe, Meredith C. (counsel for Amici Curiae Restaurant Law Center, Retail Litigation Center, Inc., and National Retail Federation)

55.   Sorrell, W. Drew II (counsel for Defendant/Appellant)

56.   Steinmetz, Eric (Plaintiff/Appellee)

57.   Summers, Daniel (former Plaintiff)

Steinmetz, *et al.* v. Brinker International, Inc.; No. 21-13146

58.    Tarpley, Philip A (former counsel for Defendant/Appellant)

59.    Theus, Shenika (Plaintiff/Appellee)

60.    Varcoe, Andrew R. (counsel for Amicus Curiae Chamber of
        Commerce of the United States of America)

61.    White, Deborah R. (counsel for Amicus Curiae Retail Litigation
        Center, Inc.)

62.    Wolfson, Tina (counsel for Plaintiffs/Appellees)

63.    Yanchunis, John Allen (counsel for Plaintiffs/Appellees)


Corporate Disclosure Statement

Brinker International, Inc. ("Brinker") is a publicly traded corporation

(NYSE: EAT).  Brinker has no parent company, and no publicly held corporation

owns 10% or more of Brinker's stock.

/s/ Jonathan S. Franklin
Jonathan S. Franklin

August 15, 2023                  *Counsel for Appellant*

## RULE 35 STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that—for the reasons Judge Branch stated in her dissent—the panel decision is contrary to the following decisions of the Supreme Court of the United States or the precedents of this circuit and that consideration by the full court is necessary to secure and maintain the uniformity of decisions in this court: *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021); *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016); *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

Further, I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:

> Whether, under the Rules Enabling Act, Fed. R. Civ. P. 23, and the precedents cited above, a court can premise class certification on a plan to award "average" damages to claimants for injuries those claimants undisputedly did not suffer.

By answering that question incorrectly, the panel's decision invites an unwarranted proliferation of improper class actions in this Circuit.

*/s/ Jonathan S. Franklin*
Jonathan S. Franklin

August 15, 2023                        *Attorney of Record for Appellant*

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT .................................................................. C-1

RULE 35 STATEMENT OF COUNSEL ................................................................. i

TABLE OF CITATIONS ........................................................................................ iii

STATEMENT OF THE ISSUE ASSERTED TO MERIT EN BANC
    CONSIDERATION ........................................................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
    DISPOSITION OF THE CASE .....................................................................4

STATEMENT OF FACTS NECESSARY TO ARGUMENT OF THE
    ISSUES .........................................................................................................6

      A.    The District Court's Opinion ....................................................6

      B.    The Panel Majority Opinion and Dissent .................................7

ARGUMENT ......................................................................................................10

I.    THE PANEL MAJORITY'S DECISION CONTRAVENES
    CLEAR SUPREME COURT HOLDINGS ON A
    FOUNDATIONAL LEGAL ISSUE .....................................................10

II.    THE PANEL MAJORITY'S ERROR IS OF OVERRIDING
    LEGAL IMPORTANCE ......................................................................14

CONCLUSION ...................................................................................................17

CERTIFICATE OF COMPLIANCE WITH WORD VOLUME
    LIMITATION

CERTIFICATE OF SERVICE

APPENDIX A: PANEL OPINION AND DISSENT

# TABLE OF CITATIONS

**Page(s)**

**CASES:**

*Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) ...................................4

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)............................16, 17

*Beck v. McDonald*, 848 F.3d 262 (4th Cir. 2017) ..................................................2

*Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225 (11th Cir. 2016) ........................................................................................................15

\* *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ......................... i, 4, 9, 11, 12, 14

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ..............................7

*Hannaford Bros. Co. Customer Data Sec. Breach Litig., In re*, 293 F.R.D. 21 (D. Me. 2013)........................................................................2

*McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121 (C.D. Ill. Jan. 19, 2021) .............................................................................................2

*Tershakovec v. Ford Motor Co., Inc.*, ___ F.4th ___, 2023 WL 4377585 (11th Cir. July 7, 2023)...............................................................15

\* *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..................................i, 2, 11

\* *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................*passim*

\* *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............... i, 1, 10, 11, 12, 13

**CONSTITUTIONAL PROVISION:**

U.S. Const. Art. III.............................................................................................1, 2

**STATUTE:**

\* 28 U.S.C. § 2072(b) ........................................................................................1, 11

**RULES:**

Fed. R. Civ. P. 23 ................................................................. i, 1, 4, 11, 14, 15, 17

Fed. R. Civ. P. 23(b) ................................................................................5

\* Fed. R. Civ. P. 23(b)(3) ................................................................1, 4, 10, 11, 14

Fed. R. Civ. P. 23(c)(1) ..........................................................................14

Fed. R. Civ. P. 23(f) ............................................................................5, 7

**OTHER AUTHORITIES:**

Newberg & Rubenstein on Class Actions (6th ed.).............................................14

Amy B. Doolittle & Kristin L. Bryan, *Say It Isn't So—Court Certifies Rule 23(b)(3) Damages Class in Data Breach Litigation*, Nat L. Rev. (Apr. 15, 2021) (https://tinyurl.com/2mdr73k7) .......................................................2

## STATEMENT OF THE ISSUE
## ASSERTED TO MERIT EN BANC CONSIDERATION

To be certified for class action resolution under Federal Rule of Civil Procedure 23(b)(3), damages claims must be "sufficiently cohesive," meaning that issues common to all claims must predominate over individualized issues. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). This petition presents the critically important question whether, when individualized issues relating to injury and damages predominate, a plaintiff can artificially manufacture the required cohesiveness by proposing to simply award the exact same "average" damages amounts, across multiple separate and distinct categories of damages, to every putative claimant ***even if that claimant did not suffer any of the injuries*** those damages purport to compensate.

The panel majority blessed a district court plan to do just that. For the reasons Judge Branch explained in dissent, however, that ruling contravenes the Rules Enabling Act, Rule 23, Article III, and binding Supreme Court precedent. The Rules Enabling Act "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right;'" therefore, "a class cannot be certified on the premise" that a defendant cannot raise individualized defenses to damages claims. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (quoting 28 U.S.C. § 2072(b)). It would thus violate that statute to "giv[e] plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual

1

action." *Tyson Foods*, 577 U.S. at 458-59.  And under Article III, federal courts cannot award anyone damages for an injury they did not suffer.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not," and "plaintiffs must demonstrate standing for each … form of relief that they seek"). The majority's decision contravenes these bedrock principles.

This case is a putative class action involving a 2018 incident at certain Chili's restaurants, owned by appellant Brinker International, Inc. ("Brinker"), in which some customers' payment-card data was allegedly compromised.  The named plaintiffs sought to represent cardholder classes (now just one) seeking out-of-pocket damages, lost reward-card opportunity damages, and other inherently individualized damages arising from purported mitigation actions that ***some*** class members ***may*** have taken due to the incident.  In certifying the first-ever payment-card data breach consumer class action,[1] the district court adopted plaintiffs' proposal to sidestep the inherently individualized issues of who actually suffered

---

[1]    *Cf.*, *e.g.*, *Beck v. McDonald*, 848 F.3d 262, 270-78 (4th Cir. 2017) (affirming dismissal of similar claims for lack of standing); *McGlenn v. Driveline Retail Merch., Inc.*, 2021 WL 165121, at *8-11 (C.D. Ill. Jan. 19, 2021) (denying certification); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 30-35 (D. Me. 2013) (same).  *See generally* Amy B. Doolittle & Kristin L. Bryan, *Say It Isn't So—Court Certifies Rule 23(b)(3) Damages Class in Data Breach Litigation*, Nat L. Rev. (Apr. 15, 2021) (https://tinyurl.com/2mdr73k7) (describing district court's certification as "a potential game changer").

those claimed injuries and in what amounts, and instead award ***every*** class member

"***a standard dollar amount*** for lost opportunities to accrue rewards points

(***whether or not they used a rewards card***), the value of cardholder time (***whether***

***or not they spent any time addressing the breach***), and out-of-pocket damages

(***whether or not they incurred any out-of-pocket damages***)."  Doc.167:7

(emphasis added).[2]  This methodology would thus compensate people for multiple

separate and distinct categories of injuries they concededly did not suffer, simply

because determining who suffered what injury, and in what amounts, would

necessarily require extensive individualized inquiries and thus preclude

certification.  For example, under the district court's plan, a person who never had

a rewards card or never cancelled one, and who therefore never "lost opportunities

to accrue rewards points," would nevertheless receive a "standard" amount for that

non-existent injury.  *Id*.

   The panel decertified the classes on other grounds and remanded for further

proceedings.  But in a precedential opinion, and over Judge Branch's dissent, the

panel majority expressly upheld the district court's plan to award "average"

---

2    Under Eleventh Circuit Rule 28-5, Brinker cites appendix materials by ECF
document number as Doc.[DOCUMENT NUMBER]:[PINPOINT
CITATION(S)]:[LINE NUMBER(S)].  Where available, pinpoint citations refer to
page numbers generated by ECF headers.  Sealed documents are identified as
Doc.[NUMBER] (SEALED DOCUMENT), [EXHIBIT
DESIGNATION]:[PINPOINT CITATION(S)].

damages amounts to every class member for multiple categories of purported injuries, ***regardless of whether they suffered a corresponding injury***.  Panel Opinion ("Op.") at 18-19.  For the reasons Judge Branch set forth, the majority's erroneous determination requires immediate correction.  A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted); *see Am. Exp. Co. v. Italian Colors Rest*., 570 U.S. 228, 234 (2013) ("[Rule 23] imposes stringent requirements for certification that in practice exclude most claims.").  Yet under the majority's analysis, disparately-situated plaintiffs can now be treated identically, including by being compensated for multiple categories of injuries ***they did not suffer***, solely to artificially manufacture the cohesiveness Rule 23(b)(3) requires.  If that mistaken, precedential ruling is allowed to stand, vast numbers of cases in this Circuit could improperly be certified as class actions.  The Court should grant rehearing or rehearing *en banc*, vindicate Judge Branch's dissent, and reverse.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

In 2018, criminal hackers targeted Brinker's data systems and may have accessed payment-card information of some patrons at certain Brinker-owned Chili's locations.  Doc.167:2.  A few Chili's patrons filed this action later that year.  Doc.1.  The operative complaint, filed in February 2020, asserts jurisdiction under

4

the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), and brings claims for, *inter alia*, negligence under Florida or Texas law and unfair competition under California law, purportedly on behalf of a nationwide class.  Doc.95:5, 39-69.

In April 2021, the district court certified a nationwide class for the negligence claims and a California class for the unfair competition claims.  As to the negligence claims, the class is defined as:

> All persons residing in the United States who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (March and April 2018) who: (1) had their data accessed by cybercriminals and, (2) incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach.

Doc.167:37.  The unfair competition class definition is substantively identical but limited to California residents.  Doc.167:37-38.

In September 2021, this Court granted interlocutory appeal of the class-certification order under Federal Rule of Civil Procedure 23(f).  In July 2023, the panel issued a judgment vacating in part and remanding, but approving key portions of the district court's flawed analysis.  Op. 19.  As relevant here, the panel rejected "Brinker's claim that individualized damages claims will predominate over the issues common to the class under Rule 23(b)."  *Id.* at 16-19.  Judge Branch dissented from that ruling.  Dissent 6-13.

**STATEMENT OF FACTS NECESSARY TO ARGUMENT OF THE ISSUES**

### A.    The District Court's Opinion.

The plaintiffs' proposed classes were defined to include only those Chili's patrons who "incurred reasonable expenses or time spent in mitigation of the consequences" of the data incident.  Doc.167:37; *see also* Op. 19.  It is indisputable, however, that determining who among the 4.5 million allegedly affected cardholders incurred reasonable expenses or time spent in mitigation of the consequences of the breach, and in what type and amount, would require extensive individualized adjudication regarding each cardholder's circumstances.

Nevertheless, in the hope of improperly transforming those inescapably individualized issues into a common one, plaintiffs proffered an expert, Daniel Korczyk.  Korczyk proposed to "employ[] an averages method" that allocates equally to *every* class member an "average" amount for each category of damages asserted by *any* class member, regardless of whether the compensated person actually suffered the corresponding injury.  Doc.167:7-8.  Thus, based on Korczyk's non-scientific estimate that 76% of class members would have lost opportunities to accrue rewards points while replacing a rewards card, plaintiffs propose to award a flat sum (76% of Korczyk's estimate of the average value of that loss) to every class member for lost rewards points, expressly including those who *did not even have* a rewards card, much less cancelled one because of the

6

incident. *See* Doc.132-1:15-17, ¶¶ 40-45. The "lost reward point" damages that would be awarded to all class members, ***including those who did not experience the corresponding injury***—which Korczyk conceded might be a "windfall" to those class members—would be paid for by reducing the damages available to any claimant who did experience them by 24%. Doc.146 (SEALED DOCUMENT), Ex. A-13 at 206:11-207:17; Doc.132-1:17.

The district court acknowledged that Korczyk's method ignores material differences among individual class members and alters their available recoveries. *See supra* at 6-7; Doc.167:7-8, 32-33 (recognizing that "***all class members***" would receive a "standard dollar amount[s]" for various categories of injuries "***whether or not***" they actually suffered those injuries."). Yet based on its belief that "the Supreme Court has approved the use of averages methods to calculate damages," the district court deemed the approach sufficient to satisfy predominance. Doc.167:7-8, 32-33 (citing *Tyson Foods*, 577 U.S. at 459-61).

B.    **The Panel Majority Opinion And Dissent.**

This Court granted Rule 23(f) review and, although vacating class certification and remanding on other grounds,[3] the panel majority approved the

---

[3]    The majority held that the district court erred in performing its predominance analysis under *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019), by failing to "determine whether its class definitions would require individualized proof of standing." Op. 15-16 n.13. If the majority's approval of Korczyk's methodology is overturned, however, outright reversal would be

district court's analysis as to Korczyk.  The majority reasoned that "[a]t the class certification stage, all that the named plaintiffs had to prove was that a reliable damages methodology existed, not the actual damages plaintiffs sustained."  Op. 17.  And despite repeating the district court's damning admissions that Korczyk's model would award each class member a "standard" amount for certain injuries "whether or not" they suffered them, the majority approved the methodology, stating that the model was permissible under *Tyson Foods* because Korczyk "believed the 'delta between class members' damages is minimal irrespective of the type of card used or time spent.'"  *Id*. at 18.

Judge Branch dissented from the majority's damages analysis for two fundamental reasons.  Dissent 6-13.  First, she explained, the majority's assertion that each "'customer fitting within the class definitions experienced a similar injury' … cannot be true."  *Id.* at 10 (quoting Op. 19).  Instead, "[a]s the district court acknowledged, Plaintiffs' damages methodology could allow a plaintiff to be compensated for opportunities to accrue rewards points, the value of their time spent addressing the breach, and out-of-pocket damages," ***whether or not*** that plaintiff suffered each of those "separate and distinct injuries."  *Id.* at 10-11.  Such

---

warranted because individualized damages inquiries into whether and to what extent any class member suffered any category of mitigation injuries would necessarily predominate over any common issues, thus defeating certification.

a model would thus allow certain plaintiffs to "impermissibly recover damages that they otherwise would not be entitled to in an individual action." *Id.* at 11 (citing *Comcast*, 569 U.S. at 35).

Second, Judge Branch rejected the majority's reliance on *Tyson Foods*. *Id.* "Far from categorically 'approv[ing] the use of averages methods to calculate damages,'" she explained, *Tyson Foods* "was careful to reject any request to 'establish general rules governing the use of statistical evidence, or so-called representative evidence, in all class-action cases.'" *Id.* (quoting 577 U.S. at 455) (alteration original). Instead, "[t]he Court noted that plaintiffs in that case 'sought to introduce a representative sample to fill an evidentiary gap created by ***the employer's failure to keep adequate records***.'" *Id.* at 11-12 (quoting 577 U.S. at 456) (alteration and emphasis added). "And the Court concluded that reliance on this representative evidence 'did not deprive [the employer] of its ability to litigate individual defenses,' reasoning that '[s]ince there were no alternative means for the employees to establish their hours worked,' the employer was left to attack the representative evidence itself." *Id.* at 12 (quoting 577 U.S. at 457) (alterations original). "The defense was thus 'itself common to the claims made by all class members.'" *Id.*

"The justifications for using representative evidence that were present in *Tyson Foods*," Judge Branch continued, "are simply not present here." *Id.*

9

Determining if a class member possessed a rewards card, spent time addressing the breach, and suffered out-of-pocket losses all involves evidence that "is not inaccessible or controlled by Brinker," but is instead "known and controlled by the plaintiffs or … at least readily available through individualized examination" that Brinker is entitled to conduct. *Id.* Thus, "unlike *Tyson Foods*, here, the use of damages averages would deprive Brinker of its ability to litigate individual defenses where a class member's individual damages are discoverable." *Id.*

## ARGUMENT

The panel's precedential decision contravenes clear Supreme Court precedent. If left standing, it will provide a blueprint for named plaintiffs to circumvent Rule 23(b)(3)'s predominance requirement in this Circuit. The Court should grant rehearing and vindicate Judge Branch's dissent.

## I.  THE PANEL MAJORITY'S DECISION CONTRAVENES CLEAR SUPREME COURT HOLDINGS ON A FOUNDATIONAL LEGAL ISSUE.

The Supreme Court has repeatedly confirmed the unlawfulness of approaches such as Korczyk's. *See*, *e.g.*, Dissent 9-10; *Wal-Mart*, 564 U.S. at 367. In *Wal-Mart*, the Court expressly rejected a proposed "Trial by Formula" for reasons that apply equally here. 564 U.S. at 367. The proposal in *Wal-Mart* was to (1) try a representative subset of claims, thereby establishing what percentage of claims were supposedly valid; (2) multiply that percentage "by the average

10

[damages] award in the sample set to arrive at the entire class recovery;" and (3) divide that amount evenly across the class. *Id.* The Court held that "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" a class could not be certified "on the premise" that the defendant could not litigate "defenses to individual claims." *Id.* (quoting 28 U.S.C. § 2072(b)). Here, Korczyk proposes to substitute *Wal-Mart's* representative mini-trials with his own guesses from unverified, non-peer-reviewed internet sources. *E.g.*, Doc.132-1:15-16. But the same principle forecloses his effort: class action or not, no federal court can order Brinker to compensate a plaintiff for an injury ***that plaintiff*** did not in fact experience. *See also, e.g., TransUnion*, 141 S. Ct. at 2208.

The Court reiterated *Wal-Mart*'s holding in *Comcast*, specifically rejecting a model that "failed to measure damages resulting from" the particular injury alleged. 569 U.S. at 36. A failure to tie damages to a plaintiff's actual injury "would reduce Rule 23(b)(3)'s predominance requirement to a nullity" by rendering "***any*** method of measurement ... acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 35-36 (quoted at Dissent 10) (emphasis original).

The Court made the point again in *Tyson Foods*. The panel majority, following the district court's lead, wrongly interpreted *Tyson Foods* to establish that plaintiffs have *carte blanche* to seek "damages … based on averages" in near-

11

limitless circumstances.  Op. 19; *see also* Doc.167:7-8, 33.  As Judge Branch correctly observed, however, *Tyson Foods* expressly refutes that notion.  Dissent 10-12.  In accord with *Wal-Mart* and *Comcast*, *Tyson Foods* explains that the use of representative evidence in a class action is permissible ***only*** if that evidence "could have been used to establish liability in an individual [case]," ***and*** its use would "not deprive [the defendant] of its ability to litigate individual defenses." 577 U.S. at 457-58.  Otherwise, use of average damages "violate[s] the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action." *Id.* at 458.  And the methodology was allowed in *Tyson Foods* only "to fill an evidentiary gap created by the [defendant's own] failure to keep adequate records." *Id*. at 456.

The majority's decision contravenes that binding Supreme Court precedent.  As Judge Branch explained, an individual plaintiff ***who concededly did not suffer a particular injury*** could never be compensated for that injury.  Dissent 10-11.  But such improper compensation is the entire point of Korczyk's "averages" method.  *See* Op. 18; Doc.167:7.  The majority's decision is wrong for that reason alone.  Moreover, even assuming, *arguendo*, that Korczyk's model could establish a *prima facie* case, it still would not demonstrate predominance.  As *Wal-Mart* and *Tyson Foods* explain, Brinker would be entitled to exercise its due process right to defend against each individual claim by inquiring into what injury (if any) each

individual claimant actually suffered.[4]  Indeed, Korczyk openly admits that many

class members did not suffer the injuries for which he proposes to compensate

them.  *See supra* at 6-7.  And unlike in *Tyson Foods*, the evidence at issue—

regarding whether claimants took mitigation actions and, if so, in what amounts—

is within the plaintiffs' possession and readily ascertainable through individualized

inquiries.  *See* Dissent 12.  Brinker's indisputable right to conduct those inquiries

independently defeats predominance.  *Tyson Foods*, 577 U.S. at 458; *Wal-Mart*,

564 U.S. at 367.  Yet the majority did not even address the issues of individualized

defenses or Brinker's due process rights.

    This averages-over-real-world methodology is self-evidently wrong.  In an

individual action, a person who never had, or never cancelled, a rewards cards

could never receive damages for "lost opportunities to accrue rewards points."

Doc.167:7.  Likewise, a cardholder who spent no time addressing the breach or

incurred no out-of-pocket costs cannot recover for those non-existent injuries, class

action or not.  And determining who, among the 4.5 million people allegedly

affected by the incident, actually suffered those supposed injuries, and to what

---

[4]    In addition to abridging Brinker's rights, Korczyk's methodology abridges
absent class members' rights.  The "averaging" methodology lowers recoveries of
class members who took corresponding mitigation actions and awards that money
to others who did not.  That is a quintessential Rules Enabling Act violation.  A
class cannot be certified if the only way to do so is to "abridge … or modify" the
"substantive right[s]" of absent class members.  *Wal-Mart*, 564 U.S. at 367.

extent, would involve possibly millions of individualized inquiries that necessarily will predominate over any common issues and defeat certification.[5]

## II. THE PANEL MAJORITY'S ERROR IS OF OVERRIDING LEGAL IMPORTANCE.

The majority's error undermines the very foundation of class-action law. Under Rule 23, a court must examine in detail "the factual and legal issues comprising the plaintiff's cause of action" and, based on those issues, determine whether the prerequisites to certification "have been satisfied." *Comcast*, 569 U.S. at 33-34 (quotation marks omitted). Such inquiries require an honest accounting of what issues each individual claim would raise. *See*, *e.g.*, *id*. at 35-38.[6] Thus, for

---

[5]    The majority's observation that certification requires only proof "that a reliable damages methodology exist[s]," not proof of "the actual damages plaintiffs sustained," Op. 17, is irrelevant. Korczyk ***did not even try*** to "show[] that damages are capable of being calculated on an individual class member basis." Doc.152:5. Nor, as Judge Branch explained, is it relevant that Korczyk "believed the 'delta between class members' damages is minimal.'" Op. 18; *cf.* Dissent 10-11. That "delta" cannot be known without determining claimants' purported actual damages, which is precisely what Korczyk's methodology is designed to ***avoid*** doing. If Korczyk's unsupportable *ipse dixit* could establish predominance, the requirement would be meaningless. *Cf. Comcast*, 569 U.S. at 36 (rejecting approach that "would reduce Rule 23(b)(3)'s predominance requirement to a nullity").

[6]    *See also* Fed. R. Civ. P. 23(c)(1) advisory committee's note to 2003 amendment ("A critical need is to determine how the case will be tried."); 2 Newberg & Rubenstein on Class Actions § 4:55 (6th ed.) ("The potentially individualized nature of affirmative defenses requires that courts consider such defenses in undertaking the predominance analysis.").

instance, "[i]ndividualized damages issues defeat predominance if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable" or if "they are accompanied by significant individualized questions going to liability." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016) (quotations omitted). But the majority's endorsement of a plan to simply ignore the facts of each claim nullifies that rule. If Korczyk's approach were permissible—and class members could be compensated for injuries they never suffered and could never prove—Rule 23's stringent requirements would be eviscerated in vast numbers of cases.

If allowed to stand, that ruling would make this Circuit a magnet for unjustified class actions. The majority approved a methodology under which ***any*** named plaintiff could easily avoid individualized damages inquiries simply by having an expert calculate an "average" damage amount and then award that amount to every class member, regardless of whether each suffered a corresponding injury. Nor is there any apparent reason why that end-run would be limited to issues of injury and damages. For example, when individual reliance is an element of a fraud claim, it precludes class certification because whether a claimant relied on a statement or omission requires examining that individual's specific circumstances. *See, e.g., Tershakovec v. Ford Motor Co., Inc.*, __ F.4th __, 2023 WL 4377585, at *4 (11th Cir. July 7, 2023). But under the panel

15

majority's analysis, a named plaintiff could achieve certification merely by having an expert calculate an "average" reliance rate—even using the sort of non-case-specific internet research Korczyk used here—and award the same "average" damages amount to every class member regardless of whether they could actually prove reliance.  The same is true for virtually any other individualized issue.

As explained, multiple Supreme Court precedents clearly refute the majority's analysis, which is likely why even plaintiffs disclaimed that argument.[7] Nor has any other circuit adopted its flawed reasoning,   If allowed to stand, that precedential decision would constitute a dramatic and deeply consequential transformation of class action jurisprudence in this Circuit.  It would also invite forum shopping and make this Circuit a hotbed for improper class actions.  As is widely recognized, class-action litigation and settlements impose enormous costs on American businesses—and thus consumers—that often bear little or no relation to the merits of any underlying claims.  *See*, *e.g.*, Chamber of Commerce Merits Amicus Br. 18-21.  And given the "risk of 'in terrorem' settlements that class

---

[7]    On appeal, the plaintiffs (implausibly) disclaimed any notion that class members would receive damages for injuries they did not suffer, deriding as "false," "woefully inaccurate," and reliant on "out-of-context quotes" any assertion that certification was premised on such a plan.  Rule 23(f) Opp. 16-17; *see also* Appellees' Br. 45 (similar).  Yet the panel majority approved the exact plan plaintiffs were unwilling to defend:  a methodology that awards every class member "a standard dollar amount" for damages categories "whether or not" they suffered the corresponding injuries.  Op. 18.

16

actions entail," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011), the majority's ruling will likely cause the payment of millions or billions in unjustifiable litigation and settlement costs—ultimately borne by consumers—as district courts, following that rule, could certify classes contemplating payments to class members regardless of injury.  Only rehearing and reversal can correct that error—which contravenes the Rules Enabling Act, Rule 23, and the Constitution— before it becomes precedent for all future class actions in this Circuit.

## CONCLUSION

The Court should grant rehearing or rehearing *en banc* and reverse the district court's certification order.

Respectfully submitted,

*/s/ Jonathan S. Franklin*
Jonathan S. Franklin
Peter B. Siegal
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466
jonathan.franklin@nortonrosefulbright.com

Jason K. Fagelman
NORTON ROSE FULBRIGHT US LLP
220 Ross Avenue, Suite 3600
Dallas, TX 75201
(214) 855-8000

August 15, 2023                    *Counsel for Appellant*

17

## CERTIFICATE OF COMPLIANCE
## WITH WORD VOLUME LIMITATION

This document complies with the type-volume limitations of Fed. R. App. P. 35(b)(2)(A) and 11th Cir. R. 35-1 because it contains 3,894 words, excluding the parts exempted by that Rule.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), and all requirements of the 11th Circuit Rules, because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in double-spaced, 14-point Times New Roman typeface.

*/s/ Jonathan S. Franklin*
Jonathan S. Franklin

August 15, 2023                    *Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system, which served the document by email on counsel for all parties.


*/s/ Jonathan S. Franklin*
Jonathan S. Franklin

August 15, 2023                    *Counsel for Appellant*

# APPENDIX A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13146

_____

MARLENE GREEN-COOPER,
individually and on behalf of all others similarly situated, et al.,

Plaintiffs,

ERIC STEINMETZ,
individually and on behalf of all others similarly situated,

MICHAEL FRANKLIN,
individually and on behalf of all others similarly situated,

SHENIKA THEUS,
individually and on behalf of all others similarly situated,

Plaintiffs-Appellees,

*versus*

BRINKER INTERNATIONAL, INC.,

2                    Opinion of the Court                    21-13146

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:18-cv-00686-TJC-MCR

_____

Before WILSON, BRANCH, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

    Brinker International, Inc. ("Brinker"), the owner of Chili's restaurants, faced a cyber-attack in which customers' credit and debit cards were compromised.  Chili's customers have brought a class action because their information was accessed (and in some cases used) and disseminated by cybercriminals.  Below, the District Court certified the class, and Brinker appeals that decision. We vacate in part and remand for further proceedings.

## I.

    Between March and April 2018, hackers targeted the Chili's restaurant systems and stole both customer card data and personally identifiable information.[1]  Plaintiffs explain that hackers then took that data and posted it on Joker Stash, an online marketplace

_____

[1] Different locations were affected at different periods within this timeframe.

for stolen payment data. The plaintiffs explain that, based on Brinker's internal reporting, the information for all 4.5 million cards the hackers accessed in the Brinker system were found on Joker Stash.

There are three named plaintiffs in this case: Shenika Theus, Michael Franklin, and Eric Steinmetz.[2] Theus is a Texas resident who used her card at Chili's in Texas on or about March 31, 2018. She experienced five unauthorized charges on the card she had used at Chili's and canceled the card as a result, disputing the charges that were not hers. She now spends time monitoring her account to make sure there is no further misuse.

Franklin is a California resident who made two Chili's purchases in the relevant timeframe, one on or about March 17, 2018, and one on or about April 22, 2018. Franklin experienced two unauthorized charges on his account, so he canceled that credit card, spoke for hours on the phone with bank representatives, and went to the Chili's locations he had visited to collect receipts for his transactions.[3] His bank canceled the affected card.

---

[2] These plaintiffs, originally filing individual actions, moved to consolidate their cases. The District Court granted that motion.

[3] The locations Franklin visited were affected by the data breach between March 30, 2018–April 22, 2018, and March 22, 2018–April 21, 2018, respectively. Franklin visited the first Chili's on or about March 17, 2018, 13 days before the affected period, and he visited the second Chili's on or about April

Steinmetz is a Nevada resident who used his credit card at a Nevada Chili's on or about April 2, 2018.  Steinmetz called the Chili's national office, the local Chili's chain, credit reporting agencies, and his bank as a result of the data breach.  He canceled the card he used at Chili's but never experienced fraudulent charges.

Pertinent to this appeal,[4] these three plaintiffs moved to certify two classes under Federal Rules of Civil Procedure 23(a) and 23(b)(3),[5] seeking both injunctive and monetary relief: 1) a nationwide class (or alternatively a statewide class) for negligence and 2) a California statewide class for California consumer protection claims based on its unfair business practices state laws.  They were defined as follows:

> 1.  All persons residing in the United States who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (the "Nationwide Class").
>
> 2.  All persons residing in California who made a credit or debit card purchase at any affected Chili's

---

22, 2018, one day after the affected period for the second Chili's.  His card had also previously been compromised in a Whole Foods data breach in 2017.

[4] Plaintiffs originally brought a variety of other claims that are not before us. We do not address them here.

[5] Plaintiffs proffered a declaration from a damages expert to establish that a common methodology for calculating damages for individual class members existed.

location during the period of the Data Breach (the "California Statewide Class").

The District Court then certified the nationwide class for the negligence claim as follows:

> All persons residing in the United States who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (March and April 2018) who: (1) had their data accessed by cybercriminals and, (2) incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach (the "Nationwide Class").

The District Court also certified a separate California class under the state unfair competition laws:

> All persons residing in California who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (March and April 2018) who: (1) had their data accessed by cyber-criminals and, (2) incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach (the "California Statewide Class").

We then permitted Brinker to appeal these class certifications pursuant to Federal Rule of Civil Procedure 23(f).

## II.

We review a district court's certification of a class under Federal Rule of Civil Procedure 23 for abuse of discretion. *Hines v. Widnall*, 334 F.3d 1253, 1255 (11th Cir. 2003). A district court

abuses its discretion when it certifies a class that does not meet the requirements of Rule 23. *See id.* ("In order to certify a class under the FRCP, all of the requirements of Rule 23(a) must be met, as well as one requirement of Rule 23(b).").

Class certification under Rule 23(b)(3), like in this case, is only appropriate if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied" and that "the questions of law or fact common to class members predominate over any questions affecting only individual members" through "evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33, 133 S. Ct. 1426, 1432 (2013) (internal quotation marks and citations omitted). Rule 23 is more than "a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove [the existence of the elements of Rule 23]." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551 (2011).

At the same time, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," so a district court does not have a free-ranging "authority to conduct a preliminary inquiry into the merits of a suit" at the class certification stage "unless it is necessary to determine the propriety of certification." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 1195 (2013) (internal quotation marks and citations omitted).

## III.

On appeal, Brinker mounts three arguments: 1) the District Court's class certification order violates our precedent on Article III standing for class actions; 2) the District Court improperly granted certification because the class will eventually require individualized mini-trials on class members' injuries; and 3) the District Court erred by finding that a common damages methodology existed for the class. We will address each in turn.

## IV.

### A.

We start from the basic principle that at the class certification stage only the named plaintiffs need have standing.[6] *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019). Article III standing requires that 1) the plaintiff has experienced an injury that is concrete and particularized and actual or imminent, 2) the defendant's conduct is the cause of the plaintiff's injury, and 3) a

---

[6] We may review both the allegations in the complaint and evidence in the record so far to determine whether the named plaintiffs in this case have established Article III standing for class certification purposes. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264, 1271 (11th Cir. 2019) (looking at the allegations of named plaintiff to determine whether he had standing); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280–81 (11th Cir. 2000) (evaluating both named plaintiffs' allegations and the lack of evidence of injury in the record for some claims while analyzing Article III standing); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("Under elementary principles of standing, a plaintiff must allege and show that he personally suffered injury.").

decision by the court would likely redress the plaintiff's injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136 (1992). As we'll explain, only Theus satisfies *Lujan*'s standing analysis.

We begin with the concrete injury analysis. For purposes of the concrete injury analysis under Article III, we have recognized three kinds of harm: 1) tangible harms, like "physical or monetary harms"; 2) intangible harms, like "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts";[7] and, finally, 3) a "material risk of future harm" when a plaintiff is seeking injunctive relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204, 2210 (2021). And the Supreme Court most recently clarified in *TransUnion* that a mere risk of future harm, without more, does not give rise to Article III standing for recovery of damages, even if it might give rise to Article III standing for purposes of injunctive relief. *Id.* at 2210. We will take each of the named plaintiff's standing analysis in turn.

While each plaintiff puts forth a variety of allegations of harm in an effort to establish Article III standing, we need only

---

[7] Constitutional harms, like violations of the First Amendment, and reputational harms, neither of which is at issue here, are examples of traditional harms for purposes of Article III standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). Stigmatic harm is another example of intangible injury giving rise to Article III standing. *Laufer v. Arpan LLC*, 29 F.4th 1268, 1273 (11th Cir. 2022). Informational injuries can also give rise to Article III standing as intangible harms. *TransUnion*, 141 S. Ct. at 2214.

address one: hackers took these individuals' data and posted it on Joker Stash.

We said in *Tsao* that a plaintiff whose personal information is subject to a data breach can establish a concrete injury for purposes of Article III standing if, as a result of the breach, he experiences "misuse" of his data in some way. *See Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1343 (11th Cir. 2021). We typically require misuse of the data cybercriminals acquire from a data breach because such misuse constitutes both a "present" injury and a "substantial risk" of harm in the future. *Id.* at 1343, 1344 ("[W]ithout specific evidence of *some* misuse of class members' data, a named plaintiff's burden to plausibly plead factual allegations sufficient to show that the threatened harm of future identity theft was 'certainly impending'—or that there was a 'substantial risk' of such harm—will be difficult to meet." (emphasis in original and citation omitted)).

All three plaintiffs maintain that their credit card and personal information was "exposed for theft and sale on the dark web." That allegation is critical. The fact that hackers took credit card data and corresponding personal information from the Chili's restaurant systems and affirmatively posted that information for sale on Joker Stash is the misuse for standing purposes that we said was missing in *Tsao*.[8] And it establishes both a present injury—

---

[8] In *Tsao*, we said that a plaintiff had not established standing based on a state common-law negligence claim after a data breach where he alleged only that

credit card data and personal information floating around on the dark web—and a substantial risk of future injury—future misuse of personal information associated with the hacked credit card. We hold that this is a concrete injury that is sufficient to establish Article III standing.[9]

---

he had canceled his credit card and faced an increased risk of identity theft because the credit card system at a restaurant he visited had been hacked. *Tsao*, 986 F.3d at 1344. We said that because Tsao had not accompanied his allegations of increased risk of identity theft with allegations of misuse of any credit card data taken by the hackers in the restaurant breach, he could not meet Article III standing requirements. *Id.*

[9] We decided *Tsao* before *TransUnion* was published, but we see the two as consistent. *TransUnion* established that a common-law analogue analysis is required when plaintiffs allege a statutory violation. We did not conduct that analysis in *Tsao* in the context of a state common-law negligence claim. *See TransUnion*, 141 S. Ct. at 2208. But we think that the common-law analogue analysis is *sui generis* to legislature-made statutory violations because the Supreme Court has not applied it to any other kind of intangible harm. For instance, constitutional harms, reputational harms, informational harms, and stigmatic harms are all intangible injuries that give rise to Article III standing, and the Supreme Court has never conducted the common-law analogue analysis in determining whether these kinds of harms establish Article III standing. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S. Ct. 2217, 2225 (1993) (infringement of free exercise); *Meese v. Keene*, 481 U.S. 465, 473, 107 S. Ct. 1862, 1867 (1987) (reputational harms); *TransUnion*, 141 S. Ct. at 2214 (identifying informational injuries as intangible harms)*; Laufer*, 29 F.4th at 1272–73 (recognizing that under Supreme Court precedent both stigmatic and emotional harms have sufficed to establish Article III standing). So, we adhere to the reasoning of *Tsao* today. *See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) (explaining the prior panel precedent rule).

*B.*

Although all three plaintiffs adequately allege a concrete injury sufficient for Article III standing, Franklin and Steinmetz's allegations face a fatal causation issue, even at this stage of litigation.[10]

The Third Amended Complaint alleged that Franklin visited two Chili's restaurants during March and April of 2018; one in Carson, California, and one in Lakewood, California.  The at-risk timeframe for the Chili's in Carson was subsequently determined to be March 30, 2018, to April 22, 2018.  Franklin visited the Carson Chili's on March 17, 2018—well outside the affected period.  The District Court correctly concluded that "Franklin's first transaction would not qualify him for the class without additional evidence, as he dined several days outside the affected time range."

The at-risk timeframe for the Chili's in Lakewood was March 22, 2018, to April 21, 2018.  Franklin visited the Lakewood Chili's on April 22, 2018—a day shy of the affected period.  Falling outside the affected period poses a traceability problem for Franklin's allegations.  Without any allegation that he dined at a Chili's during the time that *that* Chili's was compromised in the data breach, Franklin fails to allege that his injury was "fairly . . . trace[able] to the challenged action of the defendant."  *Lujan*, 504

---

[10] Theus visited a Chili's location during the breach period for that location.  As such, her alleged injuries are fairly traceable to the Chili's data breach.

U.S. at 560, 112 S. Ct. at 2136 (alterations in original) (internal quotation marks and citation omitted).[11]

The Third Amended Complaint also alleged that Steinmetz dined at the North Las Vegas Chili's on April 4, 2018. The at-risk time frame for the North Las Vegas Chili's was subsequently determined to be April 4, 2018, to April 21, 2018. Therefore, if Steinmetz's alleged dining date is true, he falls within the affected period. The record, however, shows that the allegation was slightly—but importantly—off the mark. Steinmetz stated in response to an interrogatory and in his deposition that he dined at the North Las Vegas Chili's on April 2, 2018.[12]

Much like with Franklin, therefore, Steinmetz does not have standing because the date he dined at Chili's is right outside of the affected date range for that Chili's. The proof required for a plaintiff to establish standing varies depending on the stage of litigation.

_____

[11] The District Court found that "while [Franklin's Lakewood Chili's transaction was] one day outside the [affected] range," Brinker's chart indicating the affected time periods for various Chili's locations indicated that the end date of the affected period "could not [be] validate[d]." Therefore, the District Court included Franklin as part of the class due to that wiggle room in the affected date range. But this was error. Although the Brinker chart included a "[c]ould not validate date" disclaimer for its April 22, 2018, end date for the Carson Chili's, the chart did not include such a disclaimer for the Lakewood Chili's.

[12] Steinmetz initially stated in his deposition that he dined at the Chili's on April 3, 2018, but later corrected himself when faced with documentation to the contrary that he dined there on April 2.

*Lujan*, 504 U.S. at 561, 112 S. Ct. at 2136 ("Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). At the class certification stage, "it may be necessary for the court to probe behind the pleadings" to assess standing. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372 (1982).

Where, as here, the facts developed in discovery firmly contradict the allegation in the complaint, the District Court cannot rely on the complaint's factual allegation. Plaintiffs make no argument and provide no additional facts to cast doubt on Steinmetz's discovery admissions that he dined at Chili's *outside* of the at-risk time period. He therefore cannot fairly trace any alleged injury to Brinker's challenged action. *See Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136.

### C.

Having determined that one named plaintiff has standing, we turn to the class definitions because Rule 23(b)(3)'s predominance analysis implicates Article III standing. *Cordoba*, 942 F.3d at 1272–73 ("In some cases, whether absent class members can establish standing may be exceedingly relevant to the class certification analysis required by Federal Rule of Civil Procedure 23."). The predominance inquiry is especially important in light of *TransUnion*'s (and *Cordoba*'s) reminder that "every class member must

have Article III standing in order to recover individual damages" because a district court must ultimately weed out plaintiffs who do not have Article III standing before damages are awarded to a class. *TransUnion*, 141 S. Ct. at 2208; *Cordoba*, 942 F.3d at 1264 ("At some point before it may order any form of relief to the putative class members, the court will have to sort out those plaintiffs who were actually injured from those who were not.").

Turning to the class definitions the District Court certified, we have the following:

> All persons residing in the United States who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (March and April 2018) who: (1) had their data accessed by cybercriminals and, (2) incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach (the "Nationwide Class").

> . . .

> All persons residing in California who made a credit or debit card purchase at any affected Chili's location during the period of the Data Breach (March and April 2018) who: (1) had their data accessed by cyber-criminals and, (2) incurred reasonable expenses or time spent in mitigation of the consequences of the Data Breach (the "California Statewide Class").

The District Court explained that its class definitions "avoid later predominance issues regarding standing and the inclusion of

uninjured individuals because now individuals are not in the class unless they have had their data 'misused' per the Eleventh Circuit's *Tsao* decision, either through experiencing fraudulent charges or it being posted on the dark web." So, under the class definitions, the District Court thought that the phrase "data accessed by cybercriminals" meant either that an individual had experienced fraudulent charges or that the hacked credit card information had been posted on the dark web. And, to make sure to clear any standing bar imposed by *Tsao*, the District Court added an additional requirement that the individuals in the class must have tried to mitigate the consequences of the data breach.

While the District Court's interpretation of the class definitions surely meets the standing analysis we have outlined above for named plaintiff Theus, we note that the phrase in the class definitions "accessed by cybercriminals" is broader than the two delineated categories the District Court gave, which were limited to cases of fraudulent charges or posting of credit card information on the dark web. Therefore, we think it wise to remand this case to give the District Court the opportunity to clarify its predominance finding. It may either refine the class definitions to only include those two categories and then conduct a more thorough predominance analysis,[13] or the District Court may instead conduct a

---

[13] The District Court centered its predominance analysis around the fact that it thought it had created class definitions in which all members of the class had standing. And, while that calculus is part of the predominance inquiry, *Cordoba*, 942 F.3d at 1276, refining the class definitions is not necessary or

predominance analysis anew under Rule 23 with the existing class definitions based on the understanding that the class definitions as they now stand may include uninjured individuals under *Tsao*, who have simply had their data accessed by cybercriminals and canceled their cards as a result.  *See Cordoba*, 942 F.3d at 1274 ("The essential point, however, is that at some time in the course of the litigation the district court will have to determine whether each of the absent class members has standing before they could be granted any relief.").

On remand, the District Court should also determine the viability of the California class afresh.  As discussed *supra* part IV.B, Franklin does not have standing to bring the alleged causes of action against Brinker, including the causes of action based in California state law.  Without a named plaintiff with standing to bring the California claims, the California class cannot survive.

## V.

With standing sorted out, we are left with Brinker's final claim that individualized damages claims will predominate over

---

sufficient to satisfy the predominance inquiry as to standing under *Cordoba*. In the predominance analysis, a district court must determine whether "each plaintiff will likely have to provide some individualized proof that they have standing." *Id.* at 1275.  The District Court here did not determine whether its class definitions would require individualized proof of standing, especially as to time or effort expended to mitigate the consequences of the data breach. So, remand is appropriate to afford the District Court the opportunity to perform that analysis.

the issues common to the class under Rule 23(b)(3). As a starting point, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003). Individualized damages issues predominate if "computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable" or if "significant individualized questions go[] to liability." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016) (internal quotation marks omitted) (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008)). And "[i]ndividualized damages issues are of course least likely to defeat predominance where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (internal quotation marks and citation omitted).

At the class certification stage, all that the named plaintiffs had to prove was that a reliable damages methodology existed, not the actual damages plaintiffs sustained. Plaintiffs must demonstrate that a "model purporting to serve as evidence of damages in this class action . . . measure[s] only those damages attributable to that theory." *Comcast*, 569 U.S. at 35, 133 S. Ct. at 1433. And "[t]he first step in a damages study is the translation of the *legal theory of*

*the harmful event* into an analysis of the economic impact *of that event.*" *Id.* at 38, 133 S. Ct. at 1435 (emphasis in original and citation omitted). Here, plaintiffs' expert provided the District Court with a common methodology for calculating damages based on "a standard dollar amount for lost opportunities to accrue rewards points (whether or not they used a rewards card), the value of cardholder time (whether or not they spent any time addressing the breach), and out-of-pocket damages (whether or not they incurred any out-of-pocket damages)."[14] The plaintiffs' expert used a damages methodology based on averages because the expert believed the "delta between class members' damages is minimal irrespective of the type of card used or time spent."

---

[14] Plaintiffs' expert does not purport to provide a damages methodology based on averages to determine actual damages for each plaintiff sustained as a result of the misuse of their personal information. Such inquiry into actual damages would surely be an individual inquiry. Rather, according to the expert, the out-of-pocket damages category includes:

> such items as penalties paid by cardholders in connection with not being able to use their cards to pay bills on time, gasoline to go back to the retail establishment where the breach occurred or to the cardholder's bank or local police station, postage and stationary, overnight replacement card shipping fees, bank charges to replace cards (while unusual this cost does occur on occasion), ATM fees to get access to cash, and hiring a third party to assist cardholder recovery and security efforts.

The expert stated that data breaches typically yield damages attributable to this category somewhere in the ballpark of $38 per plaintiff.

In our analysis of a damages methodology based on averages, the focus is on "whether the sample at issue could have been used to establish liability in an individual action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 458, 136 S. Ct. 1036, 1048 (2016). In this case, each Chili's customer fitting within the class definitions experienced a similar injury of a compromised card combined with some effort to mitigate the harm caused by the compromise. So, the damages methodology is not "enlarg[ing] the class members' substantive rights" by giving class members an award for an injury they could not otherwise prove in an individual action. *Id.* (internal alterations, quotation marks, and citation omitted). Through the District Court's rigorous analysis, it found that at the class certification stage the damages model was sufficient, and it would be a "matter for the jury" to decide actual damages at trial. *Id.* at 459, 136 S. Ct. at 1049. Any individual inquiry into particularized damages resulting from the data breach, such as damages recoverable due to uncompensated loss caused by compromised personal information, does not predominate over the three categories of common damages inquiries analyzed by the plaintiffs' expert. We do not think, therefore, that the District Court's determination on this point was an abuse of discretion, so we do not disturb it here.

**VACATED IN PART AND REMANDED.**

21-13146   BRANCH, J., Concurring and Dissenting in Part      1

BRANCH, J., Specially Concurring in Part and Dissenting in Part:

I write separately to address two issues discussed in the Majority Opinion: standing and damages. First, while I agree with the Majority that Shenika Theus is the only named Plaintiff with standing, I disagree with the Majority's concrete injury analysis. Second, I dissent from the Majority's approval of Plaintiffs' damages methodology. I address each of these issues in turn.

## I.   STANDING

Beginning with standing, the Majority and I agree on several points. First, I agree that two of the three named Plaintiffs do not have standing. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019) (explaining that only named plaintiffs need to demonstrate standing at the class certification stage). Specifically, I agree that Michael Franklin and Eric Steinmetz lack standing because they failed to establish that their alleged injuries were "fairly . . . trace[able] to the challenged action of the defendant." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted). Second, with respect to Shenika Theus, the remaining named Plaintiff, I agree that Theus can establish standing—but I arrive at that conclusion for different reasons than the Majority articulates. Accordingly, my standing discussion proceeds in two parts. I first explain why I part ways with the Majority's approach and then address why Theus nonetheless establishes a concrete injury.

*A.*

To begin, I turn to my disagreement with the Majority's concrete injury analysis, which rests on two erroneous conclusions about what Plaintiffs have alleged in their third amended consolidated class action complaint ("TAC") (the operative complaint in this case).  The Majority's first conclusion rests on an allegation that is simply not contained in the TAC, and the Majority's second conclusion rests on an allegation that, when viewed in light of all the TAC's allegations, does not establish a concrete injury.

The Majority first concludes that Plaintiffs have alleged that the "hackers took [their] data and posted it on Joker Stash" (an online marketplace for stolen payment data).[1]  Plaintiffs' TAC, however, contains no such allegation.  Instead, Plaintiffs' allegations concern only the risk of "potential fraud and identity theft" based on "expos[ure]" of Plaintiffs' data due to the data breach— *i.e.*, the risk of future harm.  Accordingly, I respectfully disagree with the Majority's conclusion that the named Plaintiffs have alleged that their credit card information was posted on the dark web.

---

[1] The Majority concludes that the posting of one's credit card information on the dark web is sufficient to establish a concrete injury for all three named Plaintiffs.  To be clear, my dissent does not address whether an allegation that hackers stole Plaintiffs' data and posted it for sale on the dark web sufficiently establishes a concrete injury.  I write separately because, even assuming such an allegation was sufficient for concreteness, Plaintiffs have simply not made that allegation in this case.

As to its second conclusion, the Majority points to Plaintiffs' TAC allegation that their personal information was "exposed for theft and sale on the dark web" as "critical" to establishing a concrete injury.  Because Plaintiffs' allegations about mere "exposure" to the theft and sale of their information simply point to an increased risk of identity theft and risk of future harm, however, I disagree that this concern establishes a concrete injury.  I address the TAC,[2] the motion for class certification, and the class certification hearing in turn.[3]

Starting with the TAC, Plaintiffs' allegations concern only the risk of future harm.  Plaintiffs describe their injury as "imminent and certainly impending" (*i.e.*, futuristic) and fraud and identity theft as "potential" (*i.e.*, a mere risk).  And allegations relating to the risk of future harm are insufficient to establish a concrete injury under Article III.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210–11 (2021) (explaining that mere risk of future harm without more does not give rise to Article III standing for recovery of damages); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021) ("[A] plaintiff alleging a threat of harm does not have Article III standing . . . ."); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927–28 (11th Cir. 2020).  Indeed, we have

---

[2] The Majority confines its concrete injury analysis to the TAC.

[3] The district court and the parties on appeal rely on post-pleading litigation developments—like the motion for class certification and the class certification hearing—for their standing arguments.

held that "[e]vidence of a mere data breach does not, standing alone, satisfy the requirements of Article III standing" and that allegations of an "increased risk" of identity theft based on a data breach are likewise insufficient.  *Tsao*, 986 F.3d at 1344; *Muransky*, 979 F.3d at 933 (explaining that the allegation that the plaintiff "and members of the class continue to be exposed to an elevated risk of identity theft" is the "kind of conclusory allegation [that] is simply not enough" for an Article III injury).  Thus, because the Majority rests its concrete injury analysis on an allegation that amounts to the mere risk of future harm, I cannot join the Majority's concrete injury analysis.

The motion for class certification and the class certification hearing do not help Plaintiffs in establishing a concrete injury either.  Plaintiffs' motion for class certification largely echoes the TAC's allegations, stating that "Plaintiffs . . . experienced the . . . harm of having their Customer Data exposed to fraudulent use" and that the "evidence will establish that [Brinker's] conduct exposed [their customer data] to unauthorized third parties."  The motion makes no reference to Joker Stash—or any other site on the dark web—and states only once in passing that Plaintiffs' customer data "ha[d] been exposed and found for sale on the dark web," without any allegation of which of the Plaintiffs' data was exposed or where such data was "found."  But, as I explain below, this passing statement does not pass muster in light of Plaintiffs' admissions at the class certification hearing.

During the hearing on class certification, Plaintiffs stated that they had "uncontroverted evidence that the data that was taken from Brinker's system was posted for sale and sold on the dark web." According to Plaintiffs, at least 4.5 million cards were affected by the data breach and, according to documents they obtained from Fiserv (Brinker's processor), those 4.5 million cards— *i.e.*, one hundred percent of the cards used at Brinker's locations during the affected time period—were posted on Joker Stash. Despite these assertions at the hearing, however, when the district court asked Plaintiffs' counsel whether she knew if any of the three named Plaintiffs' cards were actually on the dark web, Plaintiffs' counsel responded: "[*W*]*e do not know* that at this point." Accordingly, by counsel's own admission, the record fails to support the conclusion that the named Plaintiffs' credit card information was either posted or sold on the dark web as a result of the data breach. To the contrary, Plaintiffs admitted that they did not know if their credit card information was on the dark web.

In sum, considering Plaintiffs' admission that they do not know whether their data was posted or sold on the dark web, I cannot join the Majority's concrete injury analysis—which rests on conclusions that are simply unsupported by the record. *See Lujan*, 504 U.S. at 561 (explaining that the proof required for standing varies "with the manner and degree of evidence required at the successive stages of the litigation"); *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (explaining that "it may be necessary for the

court to probe behind the pleadings" to assess standing at the class certification stage).

<em>B.</em>

Although I disagree with the Majority's concrete injury analysis, I nonetheless agree that Theus has suffered a concrete injury (and therefore has standing) for a different reason: she has established financial harm.  In her deposition, Theus explained that her transactions at Chili's, which occurred during the restaurant's at-risk time frame,[4] caused her to incur unauthorized charges on her account that led to an overdraft fee and a bank-imposed card replacement fee.  These unreimbursed, out-of-pocket expenses that Theus incurred are the type of "pocketbook injur[ies] [that are] . . . prototypical form[s] of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *TransUnion*, 141 S. Ct. at 2204 (explaining that "traditional tangible harms, such as . . . monetary harms" are "obvious" harms that "readily qualify as concrete injuries under Article III").  Accordingly, I conclude—for different reasons than the Majority—that Theus has alleged a concrete harm sufficient for standing.

## II.    Damages Methodology

I now turn to the damages issue and conclude that the district court erred by accepting the damages methodology offered by

---

[4] As the Majority points out, Theus does not suffer the same traceability problem that Franklin and Steinmetz do.

Plaintiffs' expert for two reasons.  First, the methodology fails to tie a damages amount to an injury actually suffered by a plaintiff. And second, the district court improperly relied on *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459–61 (2016).

In support of their motion for class certification, Plaintiffs offered an expert declaration to explain their damages methodology. Plaintiffs' expert set forth a "damages methodology applicable on a class-wide basis" by calculating four "damages elements": (1) the value of any lost opportunity to accrue rewards points; (2) the value of stolen payment card data; (3) the value of cardholder time; and (4) out-of-pocket damages.

The district court rejected Brinker's argument that the expert's methodology was overinclusive and not accurately tailored to the facts.  It explained that "[u]nder [the expert's] damages methodology, all class members would receive a standard dollar amount for lost opportunities to accrue rewards points (whether or not they used a rewards card), the value of cardholder time (whether or not they spent time addressing the breach), and out-of-pocket damages (whether or not they incurred any out-of-pocket damages)."  The court continued: "[Plaintiffs' expert] employs an averages method to compute damages, reasoning that the delta between class members' damages is minimal[,] irrespective of the type of card used or time spent."  It explained that "[a]s with any averages calculation, over or under inclusivity is going to be a risk," and noted that "the Supreme Court" in *Tyson Foods* "has approved the use of averages methods to calculate damages."  The district

court concluded that "at this point [the expert's] testimony [was] offered to show that a reliable damages calculation methodology exists, not to calculate class members' damages."

Applying Rule 23(a)'s predominance requirement, the district court determined that Plaintiffs' damages expert offered a common method of calculating damages that, despite including "payment cards that may have been breached prior to the Data Breach," "shows for class certification purposes that a common method of addressing causation and damages exists."  The court opined:

> Most data breaches are very similar to one another, such that a jury may find that a relative average reduction in damages for every class member that has been subjected to other data breaches is appropriate. As discussed above, the Supreme Court has approved the use of averages methods to calculate damages, *see Tyson Foods,* 577 U.S. [at] 459–61, and the same rationale could apply here.

Nevertheless, the district court caveated that "if it becomes obvious at any time that the calculation of damages (including accounting for multiple data breaches) will be overly burdensome or individualized, the [c]ourt has the option to decertify the class."

Brinker argues that the district court erred by concluding that Plaintiffs' "proposed damages methodology permissibly eliminated individualized issues."  Brinker contends that because it is "entitled to scrutinize each individual claim at trial by referring to

each individual class member's individual circumstances," Plaintiffs have not met Rule 23's requirement that common issues predominate over individual ones. Plaintiffs argue that the "district court did not abuse its discretion in finding [that they] met this standard."

To certify a class under Rule 23(b)(3), a district court must determine that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This predominance determination includes questions relating to damages. *See Tyson Foods*, 577 U.S. at 453–54; *Agmen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). As the Majority points out, individual damages issues predominate "if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable" or if "significant individualized questions go[] to liability." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016) (quotations omitted). Accordingly, in our analysis of a damages methodology based on averages, the focus is on "whether the sample at issue could have been used to establish liability in an individual action." *Tyson Foods*, 577 U.S. at 458.

At the class-certification stage, "a model purporting to serve as evidence of damages . . . must measure only those damages attributable to" plaintiffs' theory of liability in the case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id.* (quotation omitted). As such, a court must not only

evaluate whether a damages calculation "provide[s] a method to measure and quantify damages on a classwide basis," but also whether such a methodology constitutes "a just and reasonable inference" or whether it is "speculative." *Id.* Without this evaluation, "*any* method of measurement [could be] acceptable [at the class-certification stage] so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 35–36. And "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36.

Here, the district court approved a damages methodology that awards to all class members a standard dollar amount "for lost opportunities to accrue rewards points (*whether or not they used a rewards card*), the value of cardholder time (*whether or not they spent any time addressing the breach*), and out-of-pocket damages (*whether or not they incurred any out-of-pocket damages*)." In short, this methodology impermissibly permits plaintiffs to receive an award based on damages that they did not suffer—*i.e.*, an award that a plaintiff could not establish in an individual action. *Tyson Foods*, 577 U.S. at 458.

The Majority defends the use of representative evidence by asserting that each "customer fitting within the class definitions experienced a similar injury," but this assertion cannot be true. As the district court acknowledged, Plaintiffs' damages methodology could allow a plaintiff to be compensated for opportunities to accrue rewards points, the value of their time spent addressing the breach, and out-of-pocket damages, even though the plaintiff

suffered *none* of those harms.  Each of these damages elements relate to separate and distinct injuries that may not be common to all class members, meaning that certain plaintiffs may impermissibly recover damages that they otherwise would not be entitled to in an individual action.  *See Comcast Corp.*, 569 U.S. at 35.

The district court acknowledged that "[a]s with any averages calculation, over or under inclusivity is going to be a risk," but cited *Tyson Foods* to say that "the Supreme Court has approved the use of averages methods to calculate damages."  But *Tyson Foods* is inapposite to the facts of this case.

In *Tyson Foods*, the Supreme Court approved the use of "representative evidence" to prove that the amount of time employees spent "donning and doffing" their gear at a chicken plant, when added to their regular work hours, "amounted to more than 40 hours in a given week" in order to be entitled to recovery under the Fair Labor Standards Act.  *Tyson Foods*, 577 U.S. at 454.  Far from categorically "approv[ing] the use of averages methods to calculate damages," as the district court asserted, the Supreme Court was careful to reject any request to "establish general rules governing the use of statistical evidence, or so-called representative evidence, in all class-action cases."  *Id.* at 455.  Instead, the Court explained that "[w]hether a representative sample may be used to establish classwide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action."  *Id.* at 460.  The Court noted that plaintiffs in that case "sought to introduce a representative sample to fill an evidentiary gap created

12            BRANCH, J., Concurring and Dissenting in Part   21-13146

by the employer's failure to keep adequate records." *Id.* at 456. And the Court concluded that reliance on this representative evidence "did not deprive [the employer] of its ability to litigate individual defenses," reasoning that "[s]ince there were no alternative means for the employees to establish their hours worked," the employer was left to attack the representative evidence itself. *Id.* at 457. The defense was thus "itself common to the claims made by all class members." *Id.*

The justifications for using representative evidence that were present in *Tyson Foods* are simply not present here. In this case, the questions relevant to the damages inquiry include whether a given class member possessed a rewards card, spent time addressing a data breach, and suffered out-of-pocket losses. Unlike *Tyson Foods*, the evidence for the answers to those questions is not inaccessible or controlled by Brinker. To the contrary, that evidence would be known and controlled by the plaintiffs or is at least readily available through individualized examination. And unlike *Tyson Foods*, here, the use of damages averages would deprive Brinker of its ability to litigate individual defenses where a class members' individual damages are discoverable.

Considering that, under Plaintiffs' averages methodology, a plaintiff could be compensated for a harm he did not suffer and that *Tyson Foods* does not justify the use of averages under the facts of this case, I am left to conclude that the district court erred by accepting Plaintiffs' damages methodology when certifying Plaintiffs'

21-13146  BRANCH, J., Concurring and Dissenting in Part          13

proposed classes.  Accordingly, I dissent from the Majority's con-clusion to the contrary.

*      *      *

In sum, while I agree with the Majority's bottom line that Theus is the only named Plaintiff with standing, I disagree with the Majority's concrete injury analysis, and I conclude that Theus suf-fered an injury by establishing financial harm.  Additionally, I dis-sent from the Majority's approval of Plaintiffs' damages methodol-ogy.